**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| CHRISTINE LANGLOIS on behalf of her minor child, E.L.; LISA YORE, on behalf of her minor child, B.Y.; and ANDREA SALDANA, on behalf of her minor children, La.S. and Le.S., | ) ) ) ) ) | No. |
| | ) | **CLASS ACTION COMPLAINT** |
| Plaintiffs, | ) ) | JURY TRIAL DEMANDED |
| v. | ) ) | |
| JUUL LABS, Inc. | ) ) | |
| Defendant. | ) ) ) | |

## TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     JURISDICTION AND VENUE ...................................................................... 1

III.    PARTIES ....................................................................................................... 2

IV.     ALLEGATIONS OF FACT ........................................................................... 4

        A.      The Youth Vaping Epidemic .............................................................. 4

        B.      The Rise of JUUL ............................................................................... 8

        C.      The Secret to JUUL's Success: Hooking Kids ................................. 14

        D.      The Cost of JUUL's Success ............................................................ 25

        E.      JUUL and Schools ............................................................................ 31

        F.      JUUL's Remedial Measures ............................................................. 33

        G.      Smoking Cessation Device ............................................................... 35

V.      CLASS ACTION ALLEGATIONS .............................................................. 35

        A.      Class Definition ................................................................................ 35

VI.     CLASS CERTIFICATION REQUIREMENTS: FEDERAL RULE OF
        CIVIL PROCEDURE 23 ............................................................................. 36

VII.    CAUSES OF ACTION .................................................................................. 38

        COUNT One — VIOLATIONS OF MASSACHUSETTS'S CONSUMER
                PROTECTION ACT MASS. GEN. LAWS CH. 93A, § 1 *ET SEQ.* .................. 38

        COUNT Two — VIOLATIONS OF THE ILLINOIS CONSUMER
                FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815
                ILCS 505/1 *ET SEQ.* ......................................................................... 45

        COUNT Three — VIOLATIONS OF THE ARKANSAS DECEPTIVE
                TRADE PRACTICES ACT, ARK. CODE ANN. § 4-88-101 *ET
                SEQ.* ................................................................................................ 51

COUNT Four — VIOLATIONS OF THE CALIFORNIA UNFAIR
COMPETITION ACT, CAL. BUS. & PROF CODE § 17200 *ET
SEQ.* .................................................................................................................... 57

PRAYER FOR RELIEF ............................................................................................................. 64

JURY TRIAL DEMANDED ....................................................................................................... 65

## I.      INTRODUCTION

1.      Plaintiffs Ms. Christine Langlois, on behalf of E.L., a minor, and in her capacity as the mother and natural guardian of E.L.; Ms. Lisa Yore, on behalf of B.Y., a minor, and in her capacity as the mother and natural guardian of B.Y.; and Ms. Andrea Saldana, on behalf of La.S. and Le.S., both minors, and in her capacity as the mother and natural guardian of La.S. and Le.S. (and collectively with Ms. Langlois and Ms. Yore, "Plaintiffs"), bring this class action individually and on behalf of all similar situated parents and legal guardians of minors ("Classes") who purchased e-cigarettes that were designed, manufactured, distributed, marketed, and sold by Defendant JUUL Labs, Inc. ("JUUL," the "Company," or "Defendant").  Plaintiffs bring this action for injunctive relief and damages arising out of the injuries to their minor children caused by Defendant's wrongful conduct.

2.      Plaintiffs reasonably fear that, as described below, Defendant's marketing strategy, advertising, and product design targets minors, especially teenagers, and will increase the likelihood that minors, like minors E.L., B.Y., La.S., and Le.S., will begin using e-cigarettes and become addicted to Defendant's e-cigarette products.

## II.      JURISDICTION AND VENUE

3.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because: (i) there are 100 or more class members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one plaintiff and defendant are citizens of different states.  This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

4.      The Court has personal jurisdiction over Defendant because it does business in the District of Massachusetts and has sufficient minimum contacts with this District.  Defendant

intentionally avails itself of the markets in this State through the promotion, marketing, and sale of the products at issue in this lawsuit to render the exercise of jurisdiction by this Court permissible under Massachusetts law and the U.S. Constitution.

5.     Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. § 1391 (b)(2) and (3) because a substantial part of the events or omissions giving rise to the claims at issue in this Complaint arose in this District and Defendant is subject to the Court's personal jurisdiction with respect to this action.

## III.     PARTIES

6.     Plaintiff Christine Langlois is a resident of Massachusetts.  Ms. Langlois brings this lawsuit on behalf of E.L., a minor child, and in her capacity as the mother and natural guardian of E.L.  E.L. is also a resident of Massachusetts and purchased and used JUUL products in Massachusetts.  Even though E.L. is a minor, she was able to buy JUUL products from JUUL's website.  E.L. started vaping with JUUL products at the age of fifteen and is now seventeen years old.

7.     When E.L. started using JUUL, she believed it was safer than smoking cigarettes. While she knew cigarettes were dangerous, she was surprised to learn about the health risks of vaping.  E.L. did not know that JUUL products were addictive—but she does now, as a result of her efforts to stop vaping.  E.L. has managed to stop vaping, but it is a continual struggle for her not to start again.  E.L. experiences a craving for nicotine constantly.  She tries to distract herself from the urge to vape again by doing sit-ups and push-ups.  When she was vaping regularly, E.L. went through at least one JUULpod a week.  Her voice was constantly raspy, she had a persistent cough and went to the doctor several times as a result of her cough.  When E.L. was vaping, Ms.

2

Langlois started finding cigarettes in E.L.'s room, indicating that E.L. was smoking in addition to vaping.

8.      Plaintiff Lisa Yore is a resident of Illinois.  Ms. Yore brings this lawsuit on behalf of B.Y., a minor child, and in her capacity as the mother and natural guardian of B.Y.  B.Y. is also a resident of Illinois and purchased and used JUUL products in Illinois.  B.Y. started vaping with JUUL products in the eighth grade, when he was thirteen years old.  He is now in the tenth grade, fifteen years old, and still vaping.  B.Y. is a heavy vaper.  For a while, he went through one to two JUULpods a day and had a constant barking cough.  When he started JUULing, B.Y. did not believe there was any nicotine in the product.  Instead, he thought JUULpods only contained flavored water vapor and he was attracted to the fruit flavors.  B.Y. did not think there were any health risks associated with JUUL and did not know JUUL products were addictive until he tried to stop.  Over two years later, B.Y. is now on his fifth attempt at stopping and experiences pounding headaches, cold sweats, and has a hard time focusing.

9.      Plaintiff Andrea Saldana is a resident of Arkansas.  Ms. Saldana brings this lawsuit on behalf of La.S. and Le.S., both minors, and in her capacity as the mother and natural guardian of La.S. and Le.S.  La.S. and Le.S. are also residents of Arkansas and purchased and used JUUL products in Arkansas.

10.     La.S. is seventeen years old and vapes constantly.  She goes through 1.5 JUULpods a day and spends half of her paycheck on JUUL products, approximately $50 to $60 a week.  La.S. vapes so much that she can no longer run or play softball.  La.S. has a hacking cough when she wakes up in the morning, sounds like she's been smoking for twenty years, and is also argumentative and irritable when she runs out of her JUULpods.  La.S. wants to stop

3

using JUUL but has not been able to.  La.S. was able to purchase JUULpods online using her school email account, despite the fact that it clearly indicates her status as a student.

11.    Le.S. is fifteen years old and uses JUUL products regularly.  She goes through a half a JUULpod every two days and spends approximately $15 to $20 a week on JUULpods. She also wants to quit vaping but has been unable to do so.

12.    Both La.S. and Le.S. thought vaping was safer than smoking cigarettes and did not know about the health risks of JUUL when they began using JUUL.  La.S. and Le.S. did not know that JUUL products were addictive and believed that they were only inhaling a flavor product.  Many students at La.S. and Le.S.'s schools use JUUL, including most of La.S. and Le.S.'s friends.  La.S. and Le.S. first started with mint-flavored JUULpods, but also use the Mango JUULpods.  A tobacco store near Plaintiff Saldana's town sold Mango JUULpods for $35 a pod because the demand for Mango is so high.

13.    Defendant JUUL is a Delaware corporation, having its principal place of business in San Francisco, California.  JUUL originally operated under the name PAX Labs, Inc.  In 2017, it was renamed JUUL Labs, Inc. JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes, JUULpods and accessories.

## IV.    ALLEGATIONS OF FACT

### A.    The Youth Vaping Epidemic

14.    One of the great public health success stories over the past decade has been a reduction in youth tobacco use and in nicotine addiction.  Youth smoking rates plummeted from 28% in 2000 to 7.6% in 2017.[1]  This success has been the result of years of litigation and strict

---

[1] Meredith Berkman, *Testimony of Meredith Berkman, Parents Against Vaping E-cigarettes*, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Berkman-PAVe%20Testimony.pdf.

regulation.  It is also due to a public health message that Big Tobacco can no longer dispute or contradict, and which is simple, stark, and effective:  smoking kills.

15.     This incredible progress towards eliminating youth tobacco use has now largely been reversed due to e-cigarettes and vaping.  Between 2011 and 2015, e-cigarette use among high school and middle school students increased 900%.[2]  Between 2017 and 2018, e-cigarette use increased 78% among high school students, from 11.7% of high school students in 2017 to 20.8% of high schoolers in 2018.[3]  Among middle school students, e-cigarette use increased 48% between 2017 and 2018.[4]  In 2018, 4.9 million middle and high school students used tobacco products, with 3.6 million of those students using e-cigarettes.[5]  Between 2017 and 2018, the number of youth e-cigarette users increased by 1.5 million.[6]

16.     According to the Centers for Disease Control and Prevention ("CDC") Director Robert Redfield, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made reducing tobacco use.  It's putting a new generation at risk for nicotine addiction."[7]  The U.S. Food and Drug Administration ("FDA") Commissioner Scott Gottlieb described the above statistics as "astonishing" and both the FDA and the U.S. Surgeon

---

[2] Jerome Adams, *Surgeon General's Advisory on E-cigarette Use Among Youth*, Ctrs. for Disease Control & Prevention (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.
[3] *Id.*
[4] *2018 NYTS Data: A startling rise in youth e-cigarette use*, U.S. Food & Drug Admin. (Feb. 2, 2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/2018-nyts-data-startling-rise-youth-e-cigarette-use.
[5] *Id.*
[6] *Id.*
[7] *Texas governor signs law increasing the age to buy tobacco products to 21*, CNN (June 8, 2019), https://m.cnn.com/en/article/h_b4cf0b92fd821251a4ae48df9b717145.

General have appropriately characterized youth vaping as an "epidemic."[8]  The National Institute

on Drug Abuse found that the 2018 spike in nicotine vaping was the largest for any substance

recorded in 44 years, and Alex Azar, Secretary of the U.S. Department of Health and Human

Services declared that "[w]e have never seen use of any substance by America's young people

rise as rapidly as e-cigarette use [is rising]."[9]

17.     A primary cause of this epidemic is a single company:  JUUL Labs, Inc., the

maker of the JUUL e-cigarette.  JUUL entered the e-cigarette market in 2015 and now controls

over 70% of it.[10]  Over a million JUUL e-cigarettes were sold between 2015 and 2017.[11]  JUULs

are available at over 12,000 retail stores and online.[12]  In 2017, JUUL generated over $224

million in retail sales, a 621% year-over-year increase.[13]  By June 2018, sales had skyrocketed

another 783%, reaching $942.6 million.[14]  The e-cigarette category as a whole grew 97% to

---

[8] Angelica LaVito, *FDA chief Gottlieb threatens to pull e-cigarettes off market if 'astonishing' surge in teen use doesn't slow*, CNBC (Nov. 16, 2018), https://www.cnbc.com/2018/11/16/fda-chief-gottlieb-threatens-to-pull-e-cigarettes-off-market.html; Jayne O'Donnell, *FDA declares youth vaping an epidemic, announces investigation, new enforcement*, USA Today (Sept. 12, 2018), https://www.usatoday.com/story/news/politics/2018/09/12/fda-scott-gottlieb-youth-vaping-e-cigarettes-epidemic-enforcement/1266923002/.

[9] Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

[10] Richard Craver, *Juul ends 2018 with 76 percent market share*, Winston-Salem J. (Jan. 8, 2019), https://www.journalnow.com/business/juul-ends-with-percent-market-share/article_6f50f427-19ec-50be-8b0c-d3df18d08759.html.

[11] Melia Robinson, *How a startup behind the 'iPhone of vaporizers' reinvented the e-cigarette and generated $224 million in sales in a year*, Bus. Insider (Nov. 21, 2017), https://www.businessinsider.com/juul-e-cigarette-one-million-units-sold-2017-11/.

[12] *Id.*

[13] *Id.*

[14] Angelica LaVito, *Popular e-cigarette Juul's sales have surged almost 800 percent over the past year*, CNBC Health & Sci. (Sept. 11, 2018), https://www.cnbc.com/2018/07/02/juul-e-cigarette-sales-have-surged-over-the-past-year.html.

$1.96 billion in the same period, largely based on JUUL's market success.[15]  JUUL's dominance

of the e-cigarette market has been so rapid, and so complete, that the act of vaping is now

referred to as "JUULing."

18.     The U.S. Surgeon General, the FDA, the CDC, and the U.S. Department of Health

and Human Services have "[a]ll squarely pointed to JUUL as a primary cause of that

epidemic."[16]  On February 24, 2018, the FDA sent a letter to JUUL expressing concern about the

popularity of its products among youth and demanded JUUL produce documents regarding its

marketing practices.[17]  On September 12, 2018, the FDA sent letters to JUUL and other e-

cigarette manufacturers putting them on notice that their products were being used by youth at

disturbing rates.[18]  In October 2018, the FDA raided JUUL's headquarters and seized more than

a thousand documents relating to the Company's sales and marketing practices.[19]  As of

September 2019, the FDA, the Federal Trade Commission, multiple state attorney generals and

the U.S. House of Representatives Committee on Oversight and Reform have all commenced

investigations into JUUL's role in the youth vaping epidemic and whether JUUL's marketing

practices purposefully targeted youth.

---

[15] *Id.*

[16] Raja Krishnamoorthi, *Letter from U.S. Congressman Raja Krishnamoorthi, Chairman of the Subcommittee on Economic and Consumer Policy, House Committee on Oversight and Reform, to Kevin Burns, CEO of JUUL Labs, Inc.*, House Committee on Oversight & Reform (June 7, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/documents/2019-06-07.RK%20to%20Burns-JUUL%20re%20E-Cigarette%20Epidemic.pdf.

[17] Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. Food & Drug Admin. (Apr. 14, 2018), https://www.fda.gov/media/112339/download.

[18] *Letter From US FDA to Kevin Burns*, U.S. Food & Drug Admin. (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[19] Laurie McGinley, *FDA seizes Juul e-cigarette documents in surprise inspection of headquarters*, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters/.

**B.**     **The Rise of JUUL**

19.     The decline of cigarette use and the rise of JUUL is far from coincidence.  The Company was founded by Adam Bowen and James Monsees, both product designers by education and experience.  Bowen and Monsees met in Stanford University's famed graduate product design program, where the first iteration of JUUL was their final project.[20]  Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[21]

20.     Years of litigation, regulation, and education by public health advocates, the medical community, and elected officials against Big Tobacco had severely tarnished the popularity of cigarettes.  Monsees and Bowen thus set out to "deliver[] solutions that refresh the magic and luxury of the tobacco category."[22]  Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[23]  Seeking to recreate the lost "ritual and elegance that smoking once exemplified," Monsees set out to re-design the cigarette "to meet the needs of people who want to enjoy tobacco but don't self-identify with—or don't necessarily want to be associated with— cigarettes."[24]  In essence, the objective of JUUL was to build a newer, more attractive cigarette.  One that could addict a new generation of smokers.  By design, a cornerstone of the product's commercial success is its addictive nature.

---

[20] Julia Belluz, *The Vape Company Juul Said It Doesn't Target Teens. Its Early Ads Tell a Different Story*, Vox (Jan. 25, 2019), https://www.vox.com/2019/1/25/18194953/vape-juul-e-cigarette-marketing.

[21] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/ (last visited Sept. 7, 2019).

[22] *Onboardly Interview with Ploom Cofounder and CEO James Monsees*, Pax.com (Apr. 30, 2014), https://www.pax.com/blogs/press/onboardly.

[23] *Id.*

[24] *Id.*

21.     JUUL is, in many ways, the paradigmatic start-up.  It has all the markings of Silicon Valley success: staggering profit margins, meteoric growth, and status as a cultural phenomenon.  The Silicon Valley-savvy company used the framework and ideology of startup culture to catapult itself to success by every metric in the startup industry.  In 2018, JUUL's gross profit margins were 70%[25] and it represented 76.1% of the national e-cigarette market.[26]  It shattered previous records for reaching decacorn status, reaching valuation of over $10 billion in a matter of months, or four times faster than Facebook.[27]  This all came just three years after its product launch.

22.     JUUL's staggering commercial success didn't come from a blank slate.  Under the Master Settlement Agreement between Big Tobacco and the States, the public has access to hundreds of thousands of Big Tobacco's internal documents.  In creating JUUL, Monsees and Bowen carefully studied the marketing strategies, advertisements, and product design of Big Tobacco.  As Monsees candidly acknowledged, the internal tobacco documents "became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries.  And we were able to catch-up, right, to a huge, huge industry in no time.  And then we started building prototypes."[28]

---

[25] Dan Primack, *Scoop: The Numbers Behind Juul's Investor Appeal*, Axios (July 2, 2018), https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html.

[26] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market 2*, Stanford Res. into the Impact of Tobacco Advert. (2019) ("Juul Advertising"), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[27] Zack Guzman, *Juul Surpasses Facebook As Fastest Startup to Reach Decacorn Status*, Yahoo! Fin. (Oct. 9, 2019), https://finance.yahoo.com/news/juul-surpasses-facebook-fastest-startup-reach-decacorn-status-153728892.html.

[28] Montoya, *supra* note 21.

23.     Some of the Big Tobacco records that Monsees and Bowen reviewed document how to manipulate nicotine pH to maximize nicotine delivery in a vapor while minimizing the "throat hit" that may potentially deter new smokers.  Other records relate to tobacco industry market strategies and advertisements designed to lure non-smoking youth.  Monsees and Bowen were able to take advantage of an extensive online tobacco advertising research database maintained by the Stanford Research into the Impact of Tobacco Advertising ("SRITA"), an inter-disciplinary research group devoted to researching the promotional activities of the tobacco industry.  SRITA's database contains approximately 50,000 original tobacco advertisements. According to Monsees, JUUL's advertising was informed by traditional tobacco advertisements, and SRITA in particular had been very useful to JUUL.[29]

24.     Put simply, the marketing and product design of the JUUL e-cigarette, and its incredible commercial success, are based upon tactics and strategies developed by Big Tobacco. As set forth below, while Big Tobacco was prohibited from employing these tactics and strategies by virtue of the Master Settlement Agreement and subsequent regulations, nothing prevented JUUL from doing so.

25.     Imitation being the sincerest form of flattery, Big Tobacco took notice of JUUL's commercial success.  From the beginning, Altria Group, Inc. ("Altria"), formerly known as Philip Morris Companies, Inc. ("Philip Morris"), "followed Juul's journey rather closely."[30] Altria CEO Howard Willard said that, for years, his company "watched Juul carefully to see if it had staying power."[31]  Altria decided it did.  As Willard explained: "During 2018, we concluded

---

[29] Jackler, Juul Advertising at p. 27.
[30] Altria Group, Inc., Current Report (Form 8-K), Ex. 99.1 at 4 (Feb. 20, 2019), https://www.sec.gov/Archives/edgar/data/764180/000076418019000018/exhibit991-2019cagnyremarks.htm.
[31] *Id.* at 4.

that Juul had not only become the retail share leader in the U.S. e-vapor category, but that no other brand was close to it in share or future growth potential."[32]  This was enough for Altria, one of the world's largest producers and marketers of tobacco products, to call JUUL's alleged smoking cessation device a "terrific product" and invest $12.8 billion in JUUL, taking a 35% stake in the Company.[33]  This was the biggest equity investment in United States history.[34]  With this investment, Altria now owns both the number one youth initiation cigarette in the United States (the Marlboro cigarette) and the number one youth initiation e-cigarette in the United States, JUUL.

26.     This means Altria's infrastructure, shelf space, lobbying, legal expertise, and global distribution are now available to JUUL, and Altria may now appoint one-third of JUUL's board.  JUUL employees received $2 billion in bonuses, which, split among the Company's 1,500 employees, was approximately $1.3 million per employee,[35] and Altria received millions of teen customers.

27.     Altria would not have made such an investment if it did not believe it could grow JUUL's already enormous market even more.  It seems Altria will not be disappointed—JUUL's expected revenue for 2019 is $3.4 billion, nearly triple what it was in 2018.[36]  And it shows no

---

[32] *Id.* at 4.

[33] Angelica LaVito, *E-Cigarette Sales Are Booming Thanks to Juul*, CNBC (Aug. 21, 2018), https://www.cnbc.com/2018/08/21/e-cigarette-sales-are-booming-thanks-to-juul.html.

[34] Cromwell Schubarth, *Vaping Unicorn Juul Opens Lab in Mountain View Amid Furor in S.F.*, Silicon Valley Bus. J. (Feb. 5, 2019), https://www.bizjournals.com/sanjose/news/2019/02/05/juul-opens-lab-in-mountain-view.html.

[35] Olivia Zaleski, *Juul Employees to Get $2 Billion Bonus in Altria Deal*, Bloomberg (Dec. 20, 2018), https://www.bloomberg.com/news/articles/2018-12-20/juul-employees-said-to-get-2-billion-bonus-in-altria-deal.

[36] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.

signs of stopping.  This makes it even more alarming that JUUL is on the verge of becoming

further entwined with Big Tobacco.  Altria may merge with Philip Morris International Inc.,

which split from Altria (which has always remained the parent company of Philip Morris USA)

in 2008 to insulate operations abroad from domestic legal risk like federal regulatory actions and

smoking liability lawsuits.[37]  Now that the legal risk has lessened and traditional cigarette sales

are down, the two may reunite.[38]  If the merger goes through, the Company could be worth more

than $200 billion, eclipsing its closest competitor British American Tobacco, valued at $120

billion.  The deal, JUUL said, would not affect JUUL's "mission."[39]

       28.     To be clear, a key part of JUUL's "mission" is addicting youth to nicotine and

profiting from that addiction.  Beginning in the 1950s, JUUL's now corporate affiliate, Philip

Morris, intentionally marketed cigarettes to young people under the age of 21 to recruit

"replacement smokers" to ensure the economic future of the tobacco industry.[40]  Philip Morris

knew that youth smoking was essential to the tobacco industry's success and longevity, as an

internal Philip Morris document makes clear: "It is important to know as much as possible about

teenage smoking patterns and attitudes.  Today's teenager is tomorrow's potential regular

customer, and the overwhelming majority of smokers first begin to smoke while still in their

teens."[41]  For this reason tobacco companies focused on the 14-24 year-old age group, because

---

[37] Sheila Kaplan, *Philip Morris and Altria Are in Talks to Merge*, N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2019/08/27/health/philip-morris-altria-merger-tobacco.html.

[38] Nat Ives & Cara Lombardo, *Altria and Philip Morris Consider What Brand to Use if They Merge*, Wall Street J. (Aug.28, 2019), https://www.wsj.com/articles/altria-and-philip-morris-consider-what-brand-to-use-if-they-merge-11567018336.

[39] Kaplan, *supra* note 37.

[40] Amended Final Opinion at 972, *U.S. v. Philip Morris*, No. 99-cv-2496 (D.D.C. Aug. 17, 2006).

[41] *Tobacco Company Quotes on Marketing to Kids: Young Smokers: Prevalence, Trends, Implications and Related Demographic Trends*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.

"young smokers have been the critical factor in the growth" of tobacco companies and the 14-18 year-old group is an increasing segment of the smoking population.[42]  As the Vice-President of Marketing at R.J. Reynolds Tobacco Company ["RJR"] explained in 1974, the "young adult market . . . represent[s] tomorrow's cigarette business.  As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years."[43] RJR's now-infamous Joe Camel "ambassador of Cool" advertising campaign, which ran from 1988 through 1997, exemplifies the importance the tobacco industry placed on hooking young smokers early:[44]



---

[42] *Id.*

[43] C.A. Tucker, *Marketing Plans Presentation to RJRI B of D*, Truth Tobacco Industry Documents, U. of S.F. (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091.

[44] *Joe Camel: Character of the Year Advertisement*, Stanford U. Res. into the Impact of Tobacco Advert. (1990), http://tobacco.stanford.edu/tobacco_main/images.php?token2=fm_st138.php&token1=fm_img4072.php&theme_file=fm_mt015.php&theme_name=Targeting%20Teens&subtheme_name=Joe%20Camel.

29.     It is clear that JUUL, like Philip Morris and RJR before it, targeted youth as a key business demographic.  A recent study showed that 15-17 year-olds are *16 times* more likely to use JUUL than 25-34 year-olds.[45]

30.     Indeed, JUUL was well aware from the beginning that its products would appeal to youth.  A former JUUL manager, who spoke to *The New York Times* on the condition that his name not be used because he worried about facing the ire of the Company, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them.  Some people bought more JUUL kits on the Company's website than they could individually use—sometimes 10 or more devices at a time.  "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the Company's business strategy.  "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[46]

31.     This "suspicion" has been confirmed by the U.S. Surgeon General, who found that JUUL's Twitter account was being followed by adolescents and that 25% of those re-tweeting official JUUL tweets were under 18 years old.[47]

**C.     The Secret to JUUL's Success: Hooking Kids**

32.     Because of Big Tobacco's demonstrated effectiveness at addicting youth to nicotine, cigarette manufacturers operate under tight restrictions regarding their advertising and marketing activities.  By way of example, cigarette companies may not:

---

[45] D.M. Vallone et al., *Prevalence and correlates of Juul use among a national sample of youth and young adults*, Tobacco Control (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

[46] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?* N.Y. Times (Aug. 27, 2019), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[47] Adams, *supra* note 2.

A.    use outdoor advertising such as billboards;

B.    sponsor events;

C.    give free samples;

D.    pay any person to "use, display, make reference to or use as a prop any Tobacco Product, Tobacco Product package . . . in any "Media;"

E.    pay any third party to conduct any activity which the tobacco manufacturer is prohibited from doing; or

F.    sell "flavored" cigarettes.

33.    All of these above activities were prohibited because of their effectiveness at appealing to youth.  As described below, all of these activities figured prominently in JUUL's marketing campaign.

34.    According to Dr. Robert Jackler, an otolaryngologist and professor at Stanford University School of Medicine and principal investigator for SRITA, JUUL's initial marketing was "patently youth oriented."[48]  The Company's 2015 ad campaign, called "Vaporized" was designed to create a "cult-like following."[49]  Its imagery featured a vivid color scheme and models in their twenties in poses that researchers note are evocative of behaviors more characteristic of underage teens than mature adults. [50]  Dr. Jackler and his colleagues found it "clear" that this imagery resonated with underage teens who aspire to emulate trendsetting young adults.[51]

---

[48] Robert K. Jackler, *The Role of the Company in the Juul Teen Epidemic, Testimony of Robert Jackler before the House Subcommittee on Economic and Consumer Policy* at 2 ("Jackler Testimony") (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Jackler%20Testimony.pdf.
[49] *Id.* at 4.
[50] Jackler et al., *supra* note 26.
[51] *Id.* at 7.

35.     Tobacco advertisers have long understood that teens are attracted to such imagery. The Vaporized campaign was featured on the front page of VICE magazine, "the #1 youth media company in the world."[52]  In the summer of 2015, an animated series of Vaporized billboards, with the campaign's youth-appealing imagery, were displayed in New York's Times Square.[53]

36.     Over the first year after JUUL launched its ad campaign in June 2015, the Company held a series of at least 50 highly stylized parties, typically with rock music entertainment, in cities across the United States.[54]  Thousands of young people were given free nicotine-filled JUULpods (appropriately named "JUUL starter kits"), and JUUL posted photos of various young people enthusiastically puffing on JUULs across their social media channels.[55] JUUL also featured popular stars such as Katy Perry holding a JUUL at the Golden Globes.[56]


[57]

---

[52] *Id.* at 5.

[53] *Id.*

[54] *Id.* at 3

[55] *Id.*

[56] *Jackler Testimony* at 8.

[57] Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.



58

37.     JUUL knew these images would be successful in achieving this result because it intentionally crafted them to mimic specific traditional tobacco advertisements that Big Tobacco had used to target teens.  In fact, many of JUUL's ads are nearly identical to old cigarette ads that were designed to get teens to smoke.  Like its Big Tobacco predecessors, the focus of Juul's initial marketing was on colorful ad campaigns using eye-catching designs and youth-oriented imagery with themes of being cool, carefree, stylish, attractive, sexy, and popular—unusual themes and images if one's objective is to promote an adult's only smoking cessation device.

---

[58] *Id.*



59

  

60

38.     JUUL used Big Tobacco's advertising imagery, but coupled it with a modern,

state-of-the-art marketing campaign designed to target youth.  The Company relied heavily on

social media, crafting a powerful online presence, which persists even after JUUL deleted its

accounts in the face of mounting public scrutiny.  JUUL was particularly active on Instagram,

which is the most popular social media site among teens.[61]  JUUL cultivated hashtags, allowing

the Company to blend its ads in with wide range of user content, increasing exposure while

---

[59] *Virginia Slims vs Juul Advertisement*, Stanford U. Res. into the Impact of Tobacco Advert.
(2015), http://tobacco.stanford.edu/tobacco_main/images-
comp.php?token2=fm_tn_st328.php&token1=fm_tn_img10799.php&theme_file=fm_tn_mt03
5.php&theme_name=Cigs%20vs.%20eCigs&subtheme_name=Cigs%20vs%20eCigs%20JUU
L.

[60] Belluz, *supra* note 20.

[61] Jackler et al., *supra* note 26.

18

concealing the commercial nature of the content.[62]   JUUL then used hashtags to reinforce the

themes it crafted in its product design, like #style, #technology, #smart, and #gadget.   JUUL's

hashtags attracted an enormous community of youthful posts on a wide array of subjects.

According to Dr. Jackler, #Juul contains literally thousands of juvenile postings, and numerous

Instagram hashtags contain the JUUL brand name.[63]   Even after JUUL halted its own social

media posts in November 2018, viral peer-to-peer promotion among teens insured continued

corporate and product visibility among youth.[64]   In fact, community posts about JUUL increased

after the Company quit social media in the Fall of 2018.   Prior to November 2018, over a quarter

of a million posts appeared.   In the eight months *after* JUUL halted its promotional postings, the

rate of community postings increased significantly, resulting in the number of posts doubling to

over half a million.[65]   If JUUL were serious about stopping the online promotion of its product to

youth it could petition Instagram to halt these posts either based on improper youth glorification

of tobacco product use or based on protection of the Company's own trademark.   JUUL has done

nothing.

39.     JUUL also paid social media influencers to post photos of themselves with the

JUUL devices and to use the hashtags the Company was cultivating.[66]   JUUL entered a contract

with an advertising agency specifically to identify and recruit social media influencers that had at

least 30,000 followers to, according to an internal JUUL email, "establish a network of creatives

---

[62] *Id.* at 23.
[63] *Jackler Testimony* at 10.
[64] *Id.* at 11.
[65] *Id.*
[66] Jackler et al., *Juul Advertising Over Its First Three Years On The Market*, Stanford Res. into the Impact of Tobacco Advert. (Jan. 31, 2019), *supra* note 26.

to leverage as loyalists" for the JUUL brand.[67]  One such influencer was Christina Zayas, whom

JUUL paid $1,000 for just one blog post and one Instagram post in the Fall of 2017.



[68]

40.     The Company instituted an "affiliate program" to recruit those who authored

favorable reviews of its products by providing such reviewers with a 20% discount of purchases

of JUUL products.[69]  The Company even recruited JUUL users to act as part of their marketing

team by asking users to "refer a friend and get a discount."[70]

41.     Such tactics masked what were in fact JUUL advertisements as user content,

further increasing exposure and ultimately solidifying the Company in teen pop culture as a form

---

[67] Kenrick Cai, *Juul Funded High Schools, Recruited Social Media Influencers To Reach Youth, House Panel Charges*, Forbes (July 25, 2019), https://www.forbes.com/sites/kenrickcai/2019/07/25/juul-high-schools-influencers-reach-youth-house-investigation/#57735a4a33e2.

[68] Michael Nedelman et al., *#Juul: How social media hyped nicotine for a new generation*, CNN Health (Dec. 19, 2018), https://www.cnn.com/2018/12/17/health/juul-social-media-influencers/index.html.

[69] *Id.* at 9-10.

[70] *Id.* at 9.

of cultural currency.  JUUL's strategy was so successful in embedding its products into pop culture that it entered the vernacular as a verb.  The JUUL device and the term "juuling" are so pervasive that the Company effectively eliminated not only competitors, but also any potentially alarming terms like "smoking" or "e-cigarette," which could alert users of the true nature of the device or activity.  A recent study found that 63% of adolescent JUUL users did not know that the JUULpods contain nicotine.[71]  This has worked to JUUL's advantage and was in fact a deliberate part of the Company's strategy.  In the first year after its launch, not one of JUUL's 171 promotional emails said anything about nicotine content,[72] and the Company did not include nicotine warnings on the JUUL packaging until August 2018, when the Company was forced to do so.

42.     The design of the JUUL is also acutely attractive to youth.  Unlike most of its predecessors, the JUUL looks nothing like a cigarette.  Instead, the JUUL is sleek and linear and seems like the latest tech invention.  This is not surprising, given the founders' Silicon Valley product design education and training.  The evocation of technology makes the JUUL device familiar and desirable to the younger tech-savvy generation, particularly teenagers.  The JUUL device even has features reminiscent of youth-oriented tech culture and gaming, like "secret" features users can unlock, such as making the indicator light flash rainbow colors in "party mode."  The Company has been so successful in emulating technology that the small, rectangular devices are often mistaken for—or passed off as—flash drives.

---

[71] *Juul e-Cigarettes Gain Popularity Among youth, But Awareness of Nicotine Presence Remains Low*, Truth Initiative (Apr. 18, 2018), https://truthinitiative.org/sites/default/files/media/files/2019/03/JUUL-E-cigarettes-Gain-Popularity-Among-Youth-But-Awareness-of-Nicotine-Presence-Remains-Low.pdf.

[72] Jackler et al., *supra* note 26 at 25.

43.     The ability to conceal a JUUL is also part of the appeal for adolescents.  The devices are small and slim, so they fit easily in a closed hand or a pocket.  The ease and simplicity of use—there is nothing to light or unwrap, not even an on-off switch—also make it possible to covertly use a JUUL behind a turned back, which has become a trend in many schools.  Finding new ways to hide the ever-concealable JUUL has spawned products designed just for that purpose, such as apparel that allows the wearer to use the device while it is concealed in the drawstring of a hoodie or the strap of a backpack.[73]

44.     The Company also created special flavors that make its addictive, high-tech device even more attractive to adolescents.  Tobacco companies have known for decades that flavored products are key to nicotine adoption by youth.  A 1972 Brown & Williamson memorandum: "Youth Cigarette – New Concepts," specifically noted the "well known fact that teenagers like sweet products."[74]  A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers" candy company to determine which flavors enjoyed the widest appeal among youth.[75]  According to 2004 data, 17 year old smokers were more than three times likely as those over 25 to smoke flavored cigarettes and viewed flavored cigarettes as safer.[76]  For this reason, in 2009 the FDA banned flavored cigarettes pursuant to its new authority under the Family Smoking Prevention and Tobacco Control Act of 2009.  In

---

[73] Evie Blad, *'Juuling' and Teenagers: 3 Things Principals and Teachers Need to Know*, Educ. Wk. (July 18, 2018), https://www.edweek.org/ew/articles/2018/07/18/juuling-and-teenagers-3-things-principals-and.html.

[74] September 1972 memorandum to Brown & Williamson from Marketing Innovations, "Youth Cigarette - New Concepts." Bates No. 170042014.

[75] Lorillard memo on sale of Newport cigarettes, 1978 Bates No. 03537131 - 03537132EXHIBIT101.

[76] https://www.nytimes.com/2009/09/23/health/policy/23fda.html

announcing the ban, FDA Commissioner Dr. Margaret Hamburg declared that "flavored cigarettes are a gateway for many children and young adults to become regulator smokers."[77]

45.     There is no reason to believe that flavors play any different role with respect to e-cigarettes and youth.  In fact, a 2017 study of the cigarette flavor ban found that the ban was effective in lowering the number of smokers and the amount smoked by smokers, though it was associated with an increased use of menthol cigarettes (the only flavor still available).[78] According to the Surgeon General, 85% of adolescents who use e-cigarettes use flavored varieties.[79]  Studies also show that flavors motivate e-cigarette initiation among youth,[80] and that youth are much more likely to use flavored tobacco products than adults are.[81]  In fact, in September 2019, the State of Michigan banned flavored e-cigarettes, a step the governor said was needed to protect young people from the potentially harmful effects of vaping, and Governor Andrew Cuomo of New York announced that he would pursue emergency regulations to ban the sake of flavored e-cigarettes.[82]  Despite JUUL's claims that its target market is adult smokers, the Company entered the market with flavors like Cool Mint, Crème Brulee, Fruit Medley,

---

[77] *Id.*

[78] https://tobacco.ucsf.edu/more-evidence-support-eliminating-flavors-reduce-youth-cigarette-and-e-cigarette-use; referencing Courtemanche, Charles J. et al.  Influence of the Flavored Cigarette Ban on Adolescent Tobacco Use, American Journal of Preventive Medicine 2017; 52(5):e139 - e146; and MB. Harrell, et al.  Flavored e-cigarette use: Characterizing youth, young adult, and adult users.  Prev Med Rep. 2017; 5: 33–40.  Published online 2016 Nov 11. doi:  10.1016/j.pmedr.2016.11.001 PMCID: PMC5121224.

[79] https://www.ctclearinghouse.org/Customer-Content/www/topics/2444-E-Cigarette-Use-Among-Youth-And-Young-Adults.pdf

[80] Karl Paul, *Flavored Vapes Lure Teens Into Smoking and Nicotine Addiction, Study Shows*, MarketWatch (Feb. 26, 2019), https://www.marketwatch.com/story/flavored-vapes-lure-teens-into-smoking-and-nicotine-addiction-study-shows-2019-02-25.

[81] AC Villanti et al., *Flavored Tobacco Product Use in Youth and Adults: Findings From the First Wave of the PATH Study*, 53 Am. J. of Preventative Med. 139 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28318902.

[82] https://www.nytimes.com/2019/09/15/nyregion/vaping-ban-ny.html?smid=nytcore-ios-share

Cucumber, and Mango. These flavors were the reason countless adolescents, like Ms. Saldana's

two high schoolers and Ms. Yore's then middle schooler, started using JUUL products.



83

46.     The flavors pose dangers beyond luring young people into trying nicotine.

Studies now show these sweet and fruity flavors present distinct additional health hazards.

Researchers have found that some of the chemicals JUUL uses for flavor and perfume—

particularly in the Crème Brulee flavor—contain relatively high levels of acetals.[84]  Acetals are

airway-irritating chemicals that may cause lung damage.[85]  Dr. Robert Jackler said that test

results have shown that JUUL's sweet and fruity flavors "contribute[] to the increasing body of

evidence documenting toxicological effects of e-cig vapor."[86]

---

[83] Chaykowski, *supra* note 57.

[84] Susie Neilson, *Irritating Compounds Can Show Up in 'Vape Juice'*, NPR (July 30, 2019),
https://www.npr.org/sections/health-shots/2019/07/30/746238009/irritating-compounds-discovered-in-vape-juice.

[85] *Id.*

[86] *Id.*

D.     **The Cost of JUUL's Success**

47.     In addition to designing its devices to be particularly attractive to youth, JUUL designed its devices to be highly addictive.  Unlike most other e-cigarettes, which use freebase nicotine, JUUL uses patented nicotine salts from which it makes liquid nicotine cartridges, or JUULpods.[87]  Each JUULpod is, according to the Company, the equivalent of a pack of cigarettes.  Each pod contains an alarming amount of nicotine, with up to 59 mg per ml—an amount that is roughly three times the amount of nicotine that can be sold to consumers in the European Union in a JUULpod.  On top of ramping up the amount of nicotine, JUULpods enabled the Company to increase the rate and amount of nicotine delivery to the JUUL user, roughly doubling the concentration and tripling the delivery speed of nicotine of the average e-cigarette.[88]

48.     Big Tobacco spent decades manipulating nicotine in order to foster and maintain addiction in their customers.  RJR developed and patented nicotine salt additives, including nicotine benzoate, to increase nicotine delivery in cigarette smoke.  The objective was to provide an additional "nicotine kick" based on increased nicotine absorption associated with lower pH.  JUUL uses this very same concept for its market-dominating e-cigarettes.  The Company's patent for its nicotine salts describes a process for combining benzoic acids with nicotine, a formulation that mimics the nicotine salt additive developed by RJR.  JUUL's use of benzoic acid and manipulation of pH affect the palatability of nicotine inhalation by reducing the "throat hit" that users experience when vaping.  Indeed, this was the objective behind using nicotine

---

[87] Rachel Becker, *Juul's Nicotine Salts Are Dominating the Market – And Other Companies Want In*, The Verge (Nov. 21, 2018), https://www.theverge.com/2018/11/21/18105969/juul-vaping-nicotine-salts-electronic-cigarettes-myblu-vuse-markten.

[88] *How Much Nicotine is In Juul?*, Truth Initiative (Feb. 26, 2019), https://truthinitiative.org/research-resources/emerging-tobacco-products/how-much-nicotine-juul.

salts (as compared to "free base nicotine" which has a higher pH).  According to Ari Atkins, one

of the inventors of the JUUL device, "[i]n the tobacco plant, there are these organic acids that

naturally occur.  And they help stabilize the nicotine in such a way that makes it . . . I've got to

choose my words carefully here: Appropriate for inhalation."[89]

49.     Because smokers are already accustomed to a certain level of harshness and throat

hit, developing a product with low levels of harshness and minimal "throat hit" is a critical

concern if your goal is to appeal to non-smokers, for example, youth.  Minimizing the harshness

of nicotine also allows one to vape more frequently and for longer periods of time and masks the

amount of nicotine being delivered by eliminating the unpleasant throat hit normally associated

with large doses of nicotine.  The harshness of free base nicotine makes prolonged vaping

difficult; the use of nicotine salts solves that problem.  Put another way, the nicotine salt

technology behind JUULpods makes JUUL "smoke" highly potent yet hardly perceptible.

50.     The increased nicotine exposure facilitated by the JUUL device has serious health

consequences.  The ease of use and "smoothness" strip away external inhibitors and enable

extreme levels of unfettered use.  Using the Company's own calculations, consuming two

JUULpods in a day is the equivalent of consuming two to four packs of cigarettes a day.  In this

way, JUUL has not only created a new generation of e-cigarette smokers, but the Company has

also pioneered a new style of smoking—vaping—that is more nicotine-saturated than ever

before.

51.     Increased rates and duration of smoking lead to greater overall exposure to

nicotine.  Nicotine is a neurotoxin.  A highly addictive, psychoactive substance that targets brain

---

[89] David Pierce, *This Might Just Be the First Great E-Cig*, Wired.com (Apr. 21, 2015),
https://www.wired.com/2015/04/pax-juul-ecig/.

areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[90]  Studies also show that exposure to nicotine as a teen—even minimal exposure—biologically primes the brain for addiction and greatly increases likelihood of dependence on nicotine as well as other substances later in life.[91]

52.     According to congressional testimony from Dr. Jonathan Winickoff, a professor of pediatrics at Harvard Medical School and the Director of Pediatric Research in the Tobacco Research and Treatment Center, "[n]icotine addiction can take hold in only a few days, especially in the developing adolescent brain that is particularly vulnerable to addiction to nicotine. . . Many of my patients find Juul nearly impossible to stop.  Nicotine withdrawal can cause headaches, insomnia, irritability, anxiety, and depression, and these withdrawal symptoms are one of the primary reasons a nicotine addiction is difficult to overcome."[92]  Moreover, there is a lack of effective tools to help adolescents overcome nicotine addiction: there is no good data on how to treat adolescents with e-cigarette dependence; there has not been enough research on

---

[90] N.A. Goriounova & H.D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure during Adolescence for Prefrontal Cortex Neuronal Network Function*, Cold Spring Harbor Persp. in Med. 2(12) (Dec. 2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

[91] National Institute on Drug Abuse, Principles of Adolescent Substance Use Disorder:  A Research Based Guide, https://www.drugabuse.gov/publications/principles-adolescent-substance-use-disorder-treatment-research-based-guide/introduction.

[92] Jonathan Winickoff, *Testimony of Jonathan Winickoff before the U.S. House of Representatives Committee on Oversight and Reform Subcommittee on Economic and Consumer Policy* ("Winickoff Testimony") at 2, U.S. House Committee on Oversight & Reform (July 24, 2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20 Winickoff%20AAP%20Testimony.pdf.

youth tobacco cessation strategies; and most of the pharmacological therapies approved for adults have been shown to be ineffective or only marginally effective in adolescents.[93]

53.     Research in Massachusetts indicates that daily JUUL and other e-cigarette use is much more likely to continue than daily cigarette smoking.  Out of the surveyed students who reported ever using cigarettes, only 17% indicated that they remained daily smokers.  Out of the surveyed students who reported ever using e-cigarettes daily, 58% remained daily users.  This data demonstrates both that e-cigarette use in teens is very persistent, a result consistent with the addictiveness of JUUL and the difficulty teens have in trying to quit.[94]

54.     E-cigarette use also puts adolescents at increased risk for cigarette smoking. Compared to adolescents who do not use e-cigarettes, those who do are 3.5 times more likely to begin smoking cigarettes.

55.     The dangerous and destructive nature of nicotine is no recent discovery.  As a key ingredient in tobacco products, the drug and its deleterious effects have been the subject of scientific research and public health warnings for decades.  Nicotine causes cardiovascular, reproductive, and immunosuppressive problems with devastating effects.  Part of the reason the national decline in cigarette use in recent years was such a victory for public health was because there was a corresponding decline in teen exposure to nicotine.  From 2000 to 2017, the smoking rate among high school students fell by 73%.[95]

---

[93] *Id*.
[94] *Id.*
[95] Matthew L. Myers, *Press Release: On 20th Anniversary of State Tobacco Settlement (the MSA), It's Time for Bold Action to Finish the Fight Against Tobacco*, Campaign for Tobacco-Free Kids (Nov. 26, 2018), https://www.tobaccofreekids.org/press-releases/2018_11_26_msa20.

56. That trend has completely reversed. In 2018, more than one in four high school students in the United States reported using a tobacco product in the past thirty days, a dramatic increase from just one year before.[96] But there was no increase in the use of cigarettes, cigars, or hookahs during that same time period.[97] There was only increased use in a single tobacco product: e-cigarettes. While use of all other tobacco products continued to decrease as it had been for decades, e-cigarette use increased 78% in just one year.[98] This drastic reversal caused the CDC to describe youth vaping an "epidemic."[99]



57. The teen vaping epidemic of which JUUL is the architect has and will continue to have significant costs, both for individual users and for society. Nicotine addiction alone has

---

[96] https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html

[97] *Tobacco Use By Youth Is Rising: E-Cigares are the Main Reason*, Ctrs. for Disease Control & Prevention (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.

[98] Scott Gottlieb, *Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes*, U.S. Food & Drug Admin. (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access.

[99] Adams, *supra* note 2.

significant health care costs, and these costs are exacerbated when adolescents are involved.

Adolescent nicotine addiction leads to memory and attention problems, and increase chances of

addiction later in life, all of which will continue to have long-lasting impacts on society.

58.     Science is also beginning to show that e-cigarettes have the potential to cause

even more, distinct health risks and costs.  The very same liquids that enable e-cigarettes to

deliver nicotine with such potency are proving to be increasingly dangerous.  When heated, the

vape liquid turns into aerosol, which may contain, in addition to nicotine, ultrafine toxic particles

such as lead, additional chemicals, and volatile organic compounds.[100]  These chemicals have the

potential to be deadly.  Vaping is now linked to conditions like chronic obstructive pulmonary

disease and seizures, and there were 193 possible cases of severe lung illness associated with e-

cigarette product use in 22 states in less than two months in the summer of 2019 alone.[101]  Public

health officials reported the first known death from a vaping-related illness on August 23,

2019.[102]  By early September 2019, lung illness tied to vaping had killed five people, and there

are now 450 possible cases of serious illness reported from 33 states.[103]

59.     Many teenagers are simply unaware of these risks, an ignorance that JUUL preys

on.  According to Dr. Winickoff, many of his patients believe JUULing is harmless:

---

[100] Lena H. Sun, *He went from hiking enthusiast to 'on death's door' within days. Doctors blamed vaping*, Wash. Post (Aug. 24, 2019), https://www.washingtonpost.com/health/one-mans-near-death-experience-with-vaping-related-lung-failure/2019/08/24/ca8ce42c-c5b4-11e9-9986-1fb3e4397be4_story.html?arc404=true.

[101] *CDC, FDA, States Continue to Investigate Severe Pulmonary Disease Among People Who Use E-cigarettes*, Ctrs. for Disease Control & Prevention (Aug. 21, 2019), https://www.cdc.gov/media/releases/2019/s0821-cdc-fda-states-e-cigarettes.html.

[102] Matt Richtel & Sheila Kaplan, *First Death in a Spate of Vaping Sicknesses Reported by Health Officials*, N.Y. Times (Aug. 23, 2019), https://www.nytimes.com/2019/08/23/health/vaping-death-cdc.html.

[103] Matt Richtel & Denise Grady, *Cases of Vaping-Related Lung Illness Surge, Health Officials Say*, N.Y. Times (Sept. 6, 2019), https://www.nytimes.com/2019/09/06/health/third-death-vaping-related-disease.html.

> Counseling teens and preteens on e-cigarette use is challenging.  Many of my patients have wildly incorrect beliefs about e-cigarettes.  They know that cigarettes are dangerous, but assume that Juul—since it's ubiquitous, comes in child-friendly flavors, and is marketed as a healthier alternative to smoking—must be harmless.  I have to explain to kids that e-cigarettes do not have the same positive health benefits as the fruits whose flavor they copy.  Even the term vapor calls to mind harmless water vapor.  There is no water in these products.

Winickoff Testimony at 1.

**E.     JUUL and Schools**

60.     In addition to severe health consequences, widespread "JUULing" has placed severe burdens on society, and schools in particular are suffering.  Across the United States, schools have had to divert resources and administrators have had to go to extreme lengths to respond to the ever-growing number of students using JUULs on school grounds.  JUULs have completely changed school bathrooms—in the words of one high school student, "it's just a cloud."[104]  Some schools have responded by removing bathroom doors or even shutting bathrooms down.[105]  Other schools have paid thousands of dollars to install special monitors to detect vaping, which they say is a small price to pay compared to the plumbing repairs otherwise spent as a result of students flushing vaping paraphernalia down toilets.[106]  The ubiquity of JUUL use in high school bathrooms has generated numerous online spoofs about "the juul room".

---

[104] Greta Jochem, *Juuling in School: e-Cigarette Use Prevalent Among Local Youth*, Daily Hampshire Gazette (Nov. 13, 2018), https://www.gazettenet.com/Juuling-in-Schools-21439655.

[105] Ana B. Ibarra, *The Juul's So Cool, Kids Smoke It In School*, Kaiser Health News (Mar. 26, 2018), https://khn.org/news/the-juuls-so-cool-kids-smoke-it-in-school/; Evie Blad, *'Juuling' Craze: Schools Scramble to Deal With Student Vaping*, Educ. Wk. (May 4, 2018), https://www.edweek.org/ew/articles/2018/05/09/juuling-craze-schools-scramble-to-deal-with.html.

[106] Suzanne Monaghan, *Many schools installing vape detectors in bathrooms to discourage e-cigarette use*, KYW Newsradio (June 10, 2019), https://kywnewsradio.radio.com/articles/news/many-schools-installing-vape-detectors-bathrooms-address-rise-e-cigarette-use.



why are there toilets in the juul room

[107]

61.     Such rampant JUUL use has effectively added another category to teachers' and school administrators' job descriptions; many now receive special training to respond to the various problems that JUUL use presents, both in and out of the classroom.

62.     Not content with the Company's products disrupting school life, JUUL went a step farther and actively sought to enter school campuses.  The Subcommittee on Economic and Consumer Policy ("Subcommittee") conducted a months-long investigation of JUUL, including reviewing tens of thousands of internal documents, and concluded "that the [C]ompany deliberately targeted children in order to become the nation's largest seller of e-cigarettes."[108] The Subcommittee found that "(1) Juul deployed a sophisticated program to enter schools and convey its messaging directly to teenage children; (2) Juul also targeted teenagers and children,

---

[107] *Juul Hashtag Meme*, Stanford U. Res. into the Impact of Tobacco Advert. (2018), http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st681.php&token1=fm_pods_img37610.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=%23juul.
[108] https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf ("Subcommittee Memo").

as young as eight years-old, in summer camps and public out-of-school programs; and (3) Juul recruited thousands of online "influencers" to market to teens."[109]

63.     According to the Subcommittee, the Company was willing to pay schools and organizations hundreds of thousands of dollars to have more direct access to kids.  Such attempts included paying a Baltimore charter school organization $134,000 to start a summer camp to teach kids healthy lifestyles, for which JUUL itself would provide the curriculum; offering schools $10,000 to talk to students on campus; and giving the Police Activities League in Richmond, California, $90,000 to provide JUUL's own vaping education program, "Moving On," to teenage students suspended for using cigarettes.[110]  Meanwhile, JUUL would collect data about test scores, surveys, and activity logs about the students.

64.     Among the more egregious incidents reported by the Subcommittee was a July 24, 2019 presentation in which no parents or teachers were in the room for the presentation, the message conveyed was that the JUUL product was "totally safe," and the presenter even demonstrated to the students how to use a JUUL.[111]  The school was presumably paid for this meeting, which was marketed to the school as an anti-smoking initiative.  A JUUL spokesman said the Company is no longer funding such programs.[112]

F.     **JUUL's Remedial Measures**

65.     In the face of increasing public scrutiny and pressure, JUUL has taken action to curb underage use of its products, but its efforts have been ineffective at best and aggravating at worse.  After media and researchers brought JUUL's advertising tactics front and center, the

---

[109] *Id.* at 1.
[110] Sheila Kaplan, *Juul Targeted Schools and Youth Camps, House Panel on Vaping Claims*, N.Y. Times (July 25, 2019), https://www.nytimes.com/2019/07/25/health/juul-teens-vaping.html.
[111] Subcommittee Memo at 1.
[112] *Id.*

Company launched a new ad campaign focusing on former smokers and deleted social media accounts. But, JUUL designed its social media campaign to subsist off of user-made content, which remains unaffected by the absence of a JUUL-run account. In fact, as noted above, posts relating to JUUL increased after the Company stopped its direct social advertising campaign.

66. JUUL's efforts to curb underage use through alterations to the product itself are similarly either ineffective or potentially damaging. The Company's approach to its flavored products illustrates this point. In response to serious concerns about flavored products and youth vaping, JUUL did the following: (1) it slightly modified the flavor names (i.e., "Cool Mint" is now "Mint," "Crème Brulee" is now "Creme"); and (2) it limited the flavors carried by retail stores to tobacco and mint, while continuing to offer the full range of flavors (including popular ones such as Mango) online—a market which teens are particularly aware and adept at navigating. As Dr. Winickoff testified before Congress:

> [it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.

Winickoff Testimony at 3.

67. Similarly, restricting other flavors to online sales is of limited effectiveness. According to Dr. Winickoff, 80% of children get e-cigarettes from social sources, such as older friends, meaning that if the products are available for sale somewhere, children will get them.[113]

---

[113] *Id.*

G.      **Smoking Cessation Device**

68.     JUUL claims its mission is to "improve the lives of the world's one billion adult

smokers by eliminating cigarettes" and its advertising now encourages "making the switch."[114]

But JUUL does not have FDA approval as a cessation device.  This may be because, as one

Company engineer said: "We don't think a lot about addiction here because we're not trying to

design a cessation product at all … anything about health is not on our mind."[115]

69.     Moreover, even if JUUL were to obtain FDA approval as a legitimate smoking

cessation device, this has no impact—and certainly does not excuse—the Company's conduct

that targets youth.  Regardless of the potential health benefits to chain smokers from switching to

vaping from smoking, there is no benefit to kids from starting to vape.

## V.      CLASS ACTION ALLEGATIONS

A.      **Class Definition**

70.     Pursuant to provisions of the Federal Rules of Civil Procedure ("Rule") 23(a),

(b)(2), and (b)(3), Plaintiffs bring this action on behalf of their minor children and a Nationwide

Class under California law and three State Classes (collectively, "the Classes"), defined as

follows:

> Nationwide Class: All persons who purchased JUUL products in the United States
> and were under the age of eighteen at the time of purchase;
>
> Massachusetts State Class: All persons in Massachusetts who purchased JUUL products
> in the United States and were under the age of eighteen at the time of purchase;
>
> Illinois State Class: All persons in Illinois who purchased JUUL products in the United
> States and were under the age of eighteen at the time of purchase; and

---

[114] *Our Mission*, JUUL Labs (2019), https://www.juul.com/mission-values.
[115] Nitasha Tiku, *Startup Behind the Lambo of Vaporizers Just Launched an Intelligent e-Cigarette*, The Verge (Apr. 21, 2015), https://www.theverge.com/2015/4/21/8458629/pax-labs-e-cigarette-juul.

Arkansas State Class: All persons in Arkansas who purchased JUUL products in the
United States and were under the age of eighteen at the time of purchase.

71.     Excluded from the Classes are individuals who have personal injury claims

resulting from the conduct alleged herein.  Also excluded from the Classes are Defendant and its

subsidiaries and affiliates; all persons who make a timely election to be excluded from the

Classes; governmental entities; and the Judge to whom this case is assigned and his or her

immediate family.  Plaintiffs reserve the right to revise the definitions of the Classes based upon

information learned through discovery.

72.     Certification of Plaintiffs' claims for classwide treatment is appropriate because

Plaintiffs can prove the elements of their claims regarding liability and entitlement to damages

on a classwide basis using the same evidence as would be used to prove those elements in

individual actions alleging the same claim.

73.     This action has been brought and may be properly maintained on behalf of the

Classes proposed herein under Federal Rule of Civil Procedure 23.

74.     Plaintiffs reserve the right to modify the definition of any of the Classes prior to

class certification.

## VI.     CLASS CERTIFICATION REQUIREMENTS: FEDERAL RULE OF CIVIL PROCEDURE 23

75.     **Numerosity: Rule 23(a)(1)**.  The members of the Classes are so numerous and

geographically dispersed that individual joinder of all members of the Classes is impracticable.

Plaintiffs do not know the exact size of the Classes, but they are composed of more than 500

persons.  Members of the Classes may be notified of the pendency of this action by recognized,

Court-approved notice dissemination methods, which may include U.S. mail, electronic mail,

Internet postings, social media, and/or published notice.

76.     **Commonality and Predominance: Rules 23(a)(2) and 23(b)(3)**.  This action involves significant common questions of law and fact, which predominate over any questions affecting individual members of the Classes, including, but not limited to:

> A.     Whether Defendant engaged in the conduct alleged herein;
>
> B.     Whether Defendant made unlawful and misleading representations or material omissions with respect to JUUL products;
>
> C.     Whether Defendant unlawfully marketed its JUUL products to minors;
>
> D.     Whether Plaintiffs and members of the Classes are entitled to equitable and injunctive relief.

77.     **Typicality: Rule 23(a)(3)**.  Plaintiffs' claims are typical of the claims of the members of the Classes whom they seek to represent under Federal Rule of Civil Procedure 23(a)(3), because the minor children of Plaintiffs and members of the Classes all purchased JUUL products while under the age of eighteen.  Plaintiffs and the other members of the Classes suffered damages as a direct proximate result of the same wrongful practices by Defendant. Plaintiffs' claims arise from the same practices and courses of conduct that give rise to the claims of the other members of the Classes. Plaintiffs' claims are based upon the same legal theories as the claims of the other members of the Classes.

78.     **Adequacy: Rule 23(a)(4)**.  Plaintiffs will fairly and adequately represent and protect the interests of the members of the Classes as required by Federal Rule of Civil Procedure 23(a)(4).  Plaintiffs have retained counsel competent and experienced in complex class action litigation, including MDL litigation and other consumer protection litigation. Plaintiffs intend to prosecute this action vigorously.  Neither Plaintiffs nor their counsel have interests that conflict with the interests of the other members of the Classes.  Therefore, the interests of the members of the Classes will be fairly and adequately protected.

79.     **Declaratory and Injunctive Relief: Rule 23(b)(2)**.  Defendant has acted or refused to act on grounds generally applicable to Plaintiffs and the other members of the Classes, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the Classes as a whole.

80.     **Superiority: Rule 23(b)(3)**.  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.  The damages or other financial detriment suffered by Plaintiffs and the other members of the Classes are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for members of the Classes to individually seek redress for Defendant's wrongful conduct.

81.     Even if members of the Classes could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

## VII.   CAUSES OF ACTION

## COUNT ONE — VIOLATIONS OF MASSACHUSETTS'S CONSUMER PROTECTION ACT MASS. GEN. LAWS CH. 93A, § 1 *ET SEQ.*

82.     Plaintiff Langlois, on behalf of E.L., a minor, and in her capacity as the mother and natural guardian of E.L., incorporates each preceding paragraph as though set forth fully herein.

83.     This count is brought on behalf of the Massachusetts State Class against

Defendant.[116]

84.     Massachusetts's Consumer Protection Act, Mass. Gen. Laws ch. 93A, § 1 *et seq.*,

makes it unlawful to engage in any unfair methods of competition and unfair or deceptive acts or

practices in the conduct of any trade or commerce.  Unfair acts or practices include practices that

are within at least the penumbra of some common-law, statutory, or other established concept of

unfairness; immoral, unethical, oppressive, or unscrupulous acts; or acts that cause substantial

injury.  Deceptive acts or practices include those that would reasonably cause a person to act

differently from the way he or she otherwise would have acted.

85.     Plaintiff Langlois, E.L., and Defendant are "persons" within the meaning of Mass.

Gen. Laws ch. 93A, §1(a).

86.     Defendant engaged in "trade" and/or "commerce" within the meaning of Mass.

Gen. Laws ch. 93A, §1(a).

87.     In the course of trade and commerce, Defendant participated in unfair, deceptive

and/or unlawful acts in violation of Massachusetts's Consumer Protection Act, Mass. Gen. Laws

ch. 93A, §§ 1 *et seq.* by misrepresenting, concealing and/or suppressing material facts

concerning the JUUL device and its dangers.

88.     As alleged throughout this Complaint, Defendant violated Mass. Gen. Laws ch.

93A, § 2 and its interpretive regulations, including 940 Mass. Code Regs. 3.05 and 940 Mass.

Code Regs. 3.16, by failing to disclose material information about the nicotine content, potency,

---

[116] A demand has been sent to JUUL Labs, Inc. giving notice of the claims alleged herein
pursuant to Mass. Gen. Laws ch. 93A, § 9(3).  If after thirty days, JUUL offers a reasonable
settlement for the Massachusetts State Class, Count One will be dismissed with prejudice.

and delivery of its products and engaging in misleading advertising regarding the same,

including by:

>    A.      Failing to adequately and truthfully disclose the presence of nicotine in
>    JUUL; concealing and suppressing information regarding the presence of nicotine in
>    JUUL; and engaging in misleading advertising regarding the presence of nicotine in
>    JUUL;

>    B.      Failing to adequately and truthfully disclose the amount of nicotine in
>    JUUL; concealing and suppressing information regarding the amount of nicotine in
>    JUUL; and engaging in misleading advertising regarding the amount of nicotine in
>    JUUL;

>    C.      Failing to adequately and truthfully disclose material information
>    regarding the nicotine salts formulation in JUUL; concealing and suppressing information
>    regarding nicotine salts formulation in JUUL; and engaging in misleading advertising
>    regarding the nicotine salts formulation in JUUL;

>    D.      Failing to disclose the true nicotine exposure presented by JUUL use;
>    concealing and suppressing information regarding the true nicotine exposure presented by
>    JUUL use; and engaging in misleading advertising regarding the true nicotine exposure
>    presented by JUUL use; and

>    E.      By failing to make disclosures necessary to make Defendant's statements
>    regarding the JUUL device not misleading.

89.     As alleged throughout this Complaint, Defendant violated Mass. Gen. Laws ch.

93A, § 2 and its interpretive regulations, including 940 Mass. Code Regs. 3.05 and 940 Mass.

Code Regs. 3.16, by failing to disclose material information about the health risks posed by

JUUL use; concealing and suppressing material information relating to the health risks posed by

JUUL use; and engaging in misleading advertising regarding the health risks posed by JUUL

use, including by:

>    A.      Failing to disclose, concealing and suppressing material information
>    relating to the risk of nicotine dependency or addiction due to JUUL and engaging in
>    misleading advertising regarding the risk of nicotine dependency or addiction due to
>    JUUL;

>    B.      Failing to disclose, concealing, and suppressing information relating to the
>    health consequences of nicotine dependency or addiction through JUUL use, including

but not limited to the fact that nicotine is a neurotoxin and that nicotine causes cardiovascular, reproductive, and immunosuppressive problems;

C.       Failing to disclose, concealing, and suppressing information relating to the particularly potent threat to the adolescent brain posed by nicotine, including its effect on brain maturation, cognitive ability, mental health and personality;

D.       Failing to disclose, concealing, and suppressing information relating to the risks associated with chemicals utilized in JUULpods (in addition to nicotine) and the risks associated with aerosolized e-cigarette liquid;

E.       Falsely representing, affirmatively and/or by implication, that the JUUL was safe for use, including safe for use by children and youth, including by actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens; and

F.       By failing to make disclosures necessary to make Defendant's statements regarding the JUUL device and its safety not misleading, including representations relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings.

90.       As alleged throughout this Complaint, Defendant violated Mass. Gen. Laws ch. 93A, § 2 and its interpretive regulations, including 940 Mass. Code Regs. 3.16, by engaging in conduct offensive to public policy and engaging in immoral, unethical and unscrupulous business practices that expressly targeted a vulnerable and impressionable segment of society, children and youth, including by:

A.       Actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens;

B.       By engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push the JUUL on Defendant's behalf, and by selling JUUL in flavors designed to appeal to youth;

C. Engaging in advertising modeled on cigarette ads and featuring youthful-appearing models and designing advertising in a patently youth-oriented fashion;

D. Directing advertising to youth media outlets and media designed to appeal to children and youth, such as Instagram and other social media channels;

E. Hosting youth-focused parties across the United States, at which free JUUL samples were dispensed and in which vaping was featured prominently across JUUL-sponsored social media; and

F. Formulating JUULpods with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL products.

91. As alleged throughout this Complaint, Defendant violated Mass. Gen. Laws ch. 93A, § 2 and its interpretive regulations, including 940 Mass. Code Regs. 3.05 and 940 Mass. Code Regs. 3.16, by manipulating the design of the JUUL e-cigarette and JUULpods to maximize the addictiveness of the Company's products, suppressing and/or concealing information regarding the product's design to maximize addictiveness, and engaging in misleading advertising that failed to disclose material facts regarding the design of the product, including:

A. That the JUUL was designed to manipulate nicotine pH to maximize delivery in a vapor while minimizing irritation or "throat hit;"

B. That the JUUL was designed to facilitate addiction, and particularly youth addiction, through the use of flavors that mask the naturally harsh flavor of tobacco;

C. That while a JUULpod may contain the same amount of nicotine as a pack of cigarettes, the amount of nicotine absorbed by the body was greater due to the nature and design of the JUUL e-cigarette and JUULpod;

D. That the JUUL was designed to increase the rate and amount of nicotine delivery; and

E. That the JUUL, in short, was designed to maximize the likelihood of nicotine addiction or dependence and actively designed to facilitate rapid onset of addiction or dependence, particularly in new smokers, youth, and children.

92.    As alleged throughout this Complaint, Defendant violated Mass. Gen. Laws ch. 93A, § 2 and its interpretive regulations, including 940 Mass. Code Regs. 3.16, by manipulating the design of the JUUL to maximize its appeal to minors and youth; and by manipulating and designing the JUUL to maximize its capacity to be concealed.

93.    Consumers could not discern the true facts regarding Defendant's JUUL device for many reasons, including *inter alia*:

A.    Defendant's advertisements were directed towards, targeted at, and designed to appeal to a vulnerable segment of society, children and youth, who would be less capable of discerning the true facts relating to Defendant's addictive and dangerous product;

B.    Because the true facts relating to Defendant's nicotine formulation (nicotine salts), nicotine concentration, other chemicals utilized, and flavorings, are not readily available to the average consumer, much less children or youth; and

C.    Because the risks attendant to the aerosolized delivery of nicotine and other chemicals contained in JUUL are not readily available to or discoverable by the average consumer, much less children or youth.

94.    Defendant knowingly and intentionally misrepresented, failed to disclose, concealed and suppressed material facts regarding the JUUL device with the intent to mislead consumers.

95.    Defendant's unfair, deceptive and/or illegal practices were material to consumers and were likely to, and did in fact, deceive reasonable consumers.

96.    Defendant knew or should have known that its conduct violated Massachusetts's Consumer Protection Act, Mass. Gen. Laws ch. 93A, §§ 1 *et seq.*

97.    Defendant owed an ongoing duty to refrain from unfair, deceptive, and/or unlawful acts or practices. Defendant owed to E.L., and the Massachusetts State Class, a duty to disclose the true facts regarding the JUUL device in its marketing, including the risks of dependence or addiction, and other health risks, because:

A.      Defendant's advertisements were directed towards, targeted at, and designed to appeal to a vulnerable segment of society, children and youth;

B.      Defendant possessed unique and/or exclusive knowledge relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings;

C.      Defendant concealed and/or suppressed facts relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings; and

D.      Defendant made incomplete and misleading representations with respect to the safety of the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings, giving rise to a duty of full disclosure to make the facts omitted by Defendant not misleading.

98.      Defendant's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

99.      Defendant's unfair, deceptive and/or unlawful acts or practices are ongoing and present a continuing risk to E.L. and the Massachusetts State Class as well as the general public. Defendant's conduct therefore affects and endangers the public interest.

100.      E.L. suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's unfair, deceptive, and/or unlawful acts or practices.  E.L.'s adverse consequences or losses, including the loss of money, were foreseeable results of Defendant's misrepresentations, concealment, and suppression of material facts.  As a direct and proximate result of Defendant's violations of the Massachusetts Consumer Protection Act, therefore, E.L. has suffered injury-in-fact and actual damage.

101.      Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiff Langlois, on behalf of E.L., a minor, and in her capacity as the mother and natural guardian of E.L., seeks monetary relief against Defendant measured as the greater of (a) actual damages in an amount to be determined

at trial and (b) statutory damages in the amount of $25 for each Massachusetts State Class

member.  Because Defendant's conduct was committed willfully and knowingly, each

Massachusetts State Class member is entitled to recover up to three times actual damages, but no

less than two times actual damages.

102.    Plaintiff Langlois, on behalf of E.L., a minor, and in her capacity as the mother

and natural guardian of E.L., seeks an order enjoining Defendant's unfair and/or deceptive acts

or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief

available under the Massachusetts Consumer Protection Act.

### COUNT TWO — VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1 *ET SEQ.*

103.    Plaintiff Yore, on behalf of B.Y., a minor, and in her capacity as the mother and

natural guardian of B.Y., incorporates each preceding paragraph as though set forth fully herein.

104.    This count is brought on behalf of the Illinois State Class against Defendant.

105.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois

Consumer Fraud Act"), 815 ILCS 505/1 *et seq.*, prohibits "unfair or deceptive acts or practices,

including but not limited to the use or employment of any deception, fraud, false pretense, false

promise, misrepresentation or the concealment, suppression or omission of any material fact,

with intent that others rely upon the concealment suppression or omission of such material fact

… in the conduct of trade or commerce … whether any person has in fact been misled, deceived

or damaged thereby." 815 ILCS 505/2.

106.    Defendant is a "person" within the meaning of 815 ILCS 505/1(c).

107.    B.Y. is a "consumer" within the meaning of 815 ILCS 505/1(e).

108.    In the course of trade and commerce, Defendant participated in unfair, deceptive

and/or unlawful acts in violation of the Illinois Consumer Protection Act, 815 ILCS 505/1 *et*

*seq.*, by misrepresenting, concealing and/or suppressing material facts concerning the JUUL

device and its dangers.

109.    As alleged throughout this Complaint, Defendant violated the Illinois Consumer

Protection Act, 815 ILCS 505/1 *et seq.*, by failing to disclose material information about the

nicotine content, potency, and delivery of its products and engaging in misleading advertising

regarding the same, including by:

> A.    Failing to adequately and truthfully disclose the presence of nicotine in
> JUUL; concealing and suppressing information regarding the presence of nicotine in
> JUUL; and engaging in misleading advertising regarding the presence of nicotine in
> JUUL;

> B.    Failing to adequately and truthfully disclose the amount of nicotine in
> JUUL; concealing and suppressing information regarding the amount of nicotine in
> JUUL; and engaging in misleading advertising regarding the amount of nicotine in
> JUUL;

> C.    Failing to adequately and truthfully disclose material information
> regarding the nicotine salts formulation in JUUL; concealing and suppressing information
> regarding nicotine salts formulation in JUUL; and engaging in misleading advertising
> regarding the nicotine salts formulation in JUUL;

> D.    Failing to disclose the true nicotine exposure presented by JUUL use;
> concealing and suppressing information regarding the true nicotine exposure presented by
> JUUL use; and engaging in misleading advertising regarding the true nicotine exposure
> presented by JUUL use; and

> E.    By failing to make disclosures necessary to make Defendant's statements
> regarding the JUUL device not misleading.

110.    As alleged throughout this Complaint, Defendant violated Illinois's Consumer

Protection Act, 815 ILCS 505/1 *et seq.*, by failing to disclose material information about the

health risks posed by JUUL use; concealing and suppressing material information relating to the

health risks posed by JUUL use; and engaging in misleading advertising regarding the health

risks posed by JUUL use, including by:

A.      Failing to disclose, concealing and suppressing material information relating to the risk of nicotine dependency or addiction due to JUUL use and engaging in misleading advertising regarding the risk of nicotine dependency or addiction due to JUUL use;

B.      Failing to disclose, concealing, and suppressing information relating to the health consequences of nicotine dependency or addiction through JUUL use, including but not limited to the fact that nicotine is a neurotoxin and that nicotine causes cardiovascular, reproductive, and immunosuppressive problems;

C.      Failing to disclose, concealing, and suppressing information relating to the particularly potent threat to the adolescent brain posed by nicotine, including its effect on brain maturation, cognitive ability, mental health and personality;

D.      Failing to disclose, concealing, and suppressing information relating to the risks associated with chemicals utilized in JUULpods (aside from nicotine) and the risks associated with aerosolized e-cigarette liquid;

E.      Falsely representing, affirmatively and/or by implication, that the JUUL was safe for use, including safe for use by children and youth, including by actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, advertising on social media channels aimed at youth, and recruiting "influencers" to market to teens; and

F.      By failing to make disclosures necessary to make Defendant's statements regarding the JUUL device and its safety not misleading, including representations relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings.

111.    As alleged throughout this Complaint, Defendant violated the Illinois Consumer

Protection Act, 815 ILCS 505/1 *et seq*., by engaging in conduct offensive to public policy and

engaging in immoral, unethical and unscrupulous business practices that expressly targeted a

vulnerable and impressionable segment of society, children and youth, including by:

A.      Actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, advertising on social media channels aimed at youth, and recruiting "influencers" to market to teens;

B.      By engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and

outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push the JUUL on Defendant's behalf, and by selling JUUL in flavors;

C.      Engaging in advertising featuring youthful-appearing models and designing advertising in a patently youth-oriented fashion;

D.      Directing advertising to youth media outlets and media designed to appeal to children and youth, such as social media;

E.      Hosting youth-focused parties across the countries, at which free samples were dispensed and which were featured prominently across JUUL-sponsored social media; and

F.      Formulating JUULpods with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL.

112.    As alleged throughout this Complaint, Defendant violated the Illinois Consumer

Protection Act, 815 ILCS 505/1 *et seq*., by manipulating the design of the JUUL e-cigarette and

JUULpods to maximize the addictiveness of the product, suppressing and/or concealing

information regarding the product's design to maximize addictiveness, and engaging in

misleading advertising that failed to disclose material facts regarding the design of the product,

including:

A.      That the JUUL was designed to manipulate nicotine pH to maximize delivery in a vapor while minimizing irritation or "throat hit;"

B.      That the JUUL was designed to facilitate addiction, and particularly youth addiction, through the use of flavors that masks the naturally harsh flavor of tobacco;

C.      That while a JUULpod may contain the same amount of nicotine as a pack of cigarettes, the amount of nicotine absorbed by the body was greater due to the nature and design of the JUUL e-cigarette and JUULpod;

D.      That the JUUL was designed to increase the rate and amount of nicotine delivery; and

E.      That the JUUL, in short, was designed to maximize the likelihood of nicotine addiction or dependence and actively designed to facilitate rapid onset of addiction or dependence, particularly in new smokers, youth, and children.

113.    As alleged throughout this Complaint, Defendant violated the Illinois Consumer Protection Act, 815 ILCS 505/1 *et seq.* by manipulating the design of the JUUL e-cigarette to maximize its appeal to minors and youth; and by manipulating and designing the JUUL e-cigarette to maximize its capacity to be concealed.

114.    Consumers could not discern the true facts regarding Defendant's JUUL device for many reasons, including *inter alia*:

       A.    Defendant's advertisements were directed towards, targeted at, and designed to appeal to a vulnerable segment of society, children and youth, who would be less capable of discerning the true facts relating to Defendant's addictive and dangerous product;

       B.    Because the true facts relating to Defendant's nicotine formulation (nicotine salts), nicotine concentration, other chemicals utilized, and flavorings, are not readily available to the average consumer, much less children or youth; and

       C.    Because the risks attendant to the aerosolized delivery of nicotine and other chemicals contained in JUUL are not readily available to or discoverable by the average consumer, much less children or youth.

115.    Defendant knowingly and intentionally misrepresented, failed to disclose, concealed and suppressed material facts regarding the JUUL device with the intent to mislead consumers, such as B.Y. and the Illinois State Class.

116.    Defendant's unfair, deceptive and/or illegal practices were material to consumers and were likely to, and did in fact, deceive reasonable consumers.

117.    Defendant knew or should have known that its conduct violated the Illinois Consumer Protection Act, 815 ILCS 505/1 *et seq.*

118.    Defendant owed an ongoing duty to refrain from unfair, deceptive, and/or unlawful acts or practices.  Defendant owed to B.Y. and the Illinois State Class a duty to disclose the true facts regarding the JUUL device in their marketing, including the risks of dependence or addiction, the health risks, because:

A.    Defendant's advertisements were directed towards, targeted at, and designed to appeal to a vulnerable segment of society, children and youth;

B.    Defendant possessed unique and/or exclusive knowledge relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings;

C.    Defendant concealed and/or suppressed facts relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings; and

D.    Defendant made incomplete and misleading representations with respect to the safety of the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings, giving rise to a duty of full disclosure to make the facts omitted by Defendant not misleading.

119.    Defendant's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

120.    Defendant's unfair, deceptive and/or unlawful acts or practices are ongoing and present a continuing risk to B.Y. as well as the general public.  Defendant's conduct therefore affects and endangers the public interest.

121.    B.Y. suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's unfair, deceptive, and/or unlawful acts or practices.  B.Y.'s adverse consequences or losses, including the loss of money from purchasing JUUL products, were foreseeable results of Defendant's misrepresentations, concealment, and suppression of material facts.  As a direct and proximate result of Defendant's violations of the Illinois Consumer Protection Act, therefore, B.Y. has suffered injury-in-fact and actual damage.

122.    Pursuant to 815 ILCS 505/10a(a), the Illinois State Class seeks monetary relief against Defendant in the amount of actual damages, as well as punitive damages because Defendant acted with fraud and/or malice and/or was grossly negligent.

123.    Plaintiff Yore, on behalf of B.Y., a minor, and in her capacity as the mother and natural guardian of B.Y., seeks an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Illinois Consumer Protection Act, 815 ILCS 505/1 *et seq*.

## COUNT THREE — VIOLATIONS OF THE ARKANSAS DECEPTIVE TRADE PRACTICES ACT, ARK. CODE ANN. § 4-88-101 *ET SEQ.*

124.    Plaintiff Saldana, on behalf of La.S. and Le.S., both minors, and in her capacity as the mother and natural guardian of La.S. and Le.S., incorporates each preceding paragraph as though set forth fully herein.

125.    This count is brought on behalf of the Arkansas State Class against Defendant.

126.    The Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*, prohibits "[d]eceptive and unconscionable trade practices." The prohibited practices include, but are not limited to, a list of enumerated items, including:

   A.    "Knowingly making a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, sponsorship, approval, or certification of goods or services or as to whether goods are original or new or of a particular standard, quality, grade, style, or model;" Ark. Code Ann. § 4-88-101(a)(1);

   B.    "Knowingly taking advantage of a consumer who is reasonably unable to protect his or her interest because of: (A) Physical infirmity; (B) Ignorance; (C) Illiteracy; (D) Inability to understand the language of the agreement; or (E) A similar factor;" Ark. Code Ann. § 4-88-101(a)(8);

   C.    "Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade[.]" Ark. Code Ann. § 4-88-107(a)(10).

127.    The Arkansas Deceptive Trade Practices Act also prohibits, when utilized in connection with the sale or advertisement of any goods:

   A.    "The act, use, or employment by any person of any deception, fraud, or false pretense;" and

   B.    "The concealment, suppression, or omission of any material fact with intent that others rely upon the concealment, suppression, or omission."

51

Ark. Code Ann. § 4-88-108.

128.     Defendant, Plaintiff Saldana, La.S. and Le.S. are "persons" within the meaning of Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-102(5).

129.     JUUL devices are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

130.     In the course of its business, Defendant participated in unfair, deceptive and/or unlawful acts in violation of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.* by misrepresenting, concealing and/or suppressing material facts concerning the JUUL device and its dangers.

131.     As alleged throughout this Complaint, Defendant violated the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*, by failing to disclose material information about the nicotine content, potency, and delivery of its products and engaging in misleading advertising regarding the same, including by:

     A.     Failing to adequately and truthfully disclose the presence of nicotine in JUUL; concealing and suppressing information regarding the presence of nicotine in JUUL; and engaging in misleading advertising regarding the presence of nicotine in JUUL;

     B.     Failing to adequately and truthfully disclose the amount of nicotine in JUUL; concealing and suppressing information regarding the amount of nicotine in JUUL; and engaging in misleading advertising regarding the amount of nicotine in JUUL;

     C.     Failing to adequately and truthfully disclose material information regarding the nicotine salts formulation in JUUL; concealing and suppressing information regarding nicotine salts formulation in JUUL; and engaging in misleading advertising regarding the nicotine salts formulation in JUUL;

     D.     Failing to disclose the true nicotine exposure presented by JUUL use; concealing and suppressing information regarding the true nicotine exposure presented by JUUL use; and engaging in misleading advertising regarding the true nicotine exposure presented by JUUL use; and

     E.     By failing to make disclosures necessary to make Defendant's statements regarding the JUUL device not misleading.

132.     As alleged throughout this Complaint, Defendant violated the Arkansas Deceptive

Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*, by failing to disclose material

information about the health risks posed by JUUL use; concealing and suppressing material

information relating to the health risks posed by JUUL use; and engaging in misleading

advertising regarding the health risks posed by JUUL use, including by:

> A.      Failing to disclose, concealing and suppressing material information relating to the risk of nicotine dependency or addiction due to JUUL and engaging in misleading advertising regarding the risk of nicotine dependency or addiction due to JUUL;

> B.      Failing to disclose, concealing, and suppressing information relating to the health consequences of nicotine dependency or addiction through JUUL use, including but not limited to the fact that nicotine is a neurotoxin and that nicotine causes cardiovascular, reproductive, and immunosuppressive problems;

> C.      Failing to disclose, concealing, and suppressing information relating to the particularly potent threat to the adolescent brain posed by nicotine, including its effect on brain maturation, cognitive ability, mental health and personality;

> D.      Failing to disclose, concealing, and suppressing information relating to the risks associated with chemicals utilized in JUULpods (aside from nicotine) and the risks associated with aerosolized vape liquid;

> E.      Falsely representing, affirmatively and/or by implication, that the JUUL was safe for use, including safe for use by children and youth, including by actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, and recruiting "influencers" to market to teens; and

> F.      By failing to make disclosures necessary to make Defendant's statements regarding the JUUL device and its safety not misleading, including representations relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings.

133.     As alleged throughout this Complaint, Defendant violated Arkansas Deceptive

Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*, by engaging in conduct offensive to

public policy and engaging in immoral, unethical and unscrupulous business practices that

expressly targeted a vulnerable and impressionable segment of society, children and youth,

including by:

A.      Actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, and recruiting "influencers" to market to teens;

B.      By engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push the JUUL on Defendant's behalf, and by selling JUUL in flavors;

C.      Engaging in advertising featuring youthful-appearing models and designing advertising in a patently youth-oriented fashion;

D.      Directing advertising to youth media outlets and media designed to appeal to children and youth, such as social media;

E.      Hosting youth-focused parties across the countries, at which free samples were dispensed and which were featured prominently across JUUL-sponsored social media; and

F.      Formulating JUULpods with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL.

134.    As alleged throughout this Complaint, Defendant violated Arkansas Deceptive

Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*, by manipulating the design of the JUUL

and JUULpods to maximize the addictiveness of the product, suppressing and/or concealing

information regarding the product's design to maximize addictiveness, and engaging in

misleading advertising that failed to disclose material facts regarding the design of the product,

including:

A.      That the JUUL was designed to manipulate nicotine pH to maximize delivery in a vapor while minimizing irritation or "throat hit;"

B.      That the JUUL was designed to facilitate addiction, and particularly youth addiction, through the use of flavors that masks the naturally harsh flavor of tobacco;

C.    That a JUULpod contained more nicotine than a pack of cigarettes and further that the amount of nicotine absorbed by the body was yet greater;

D.    That the JUUL was designed to increase the rate and amount of nicotine delivery; and

E.    That the JUUL, in short, was designed to maximize the likelihood of nicotine addiction or dependence and actively designed to facilitate rapid onset of addiction or dependence, particularly in new smokers, youth, and children.

135.    As alleged throughout this Complaint, Defendant violated Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101, *et seq.* by manipulating the design of the JUUL to maximize its appeal to minors and youth; and by manipulating and designing the JUUL to maximize its capacity to be concealed.

136.    Consumers could not discern the true facts regarding Defendant's JUUL device for many reasons, including *inter alia*:

A.    Defendant's advertisements were directed towards, targeted at, and designed to appeal to a vulnerable segment of society, children and youth, who would be less capable of discerning the true facts relating to Defendant's addictive and dangerous product;

B.    Because the true facts relating to Defendant's nicotine formulation (nicotine salts), nicotine concentration, other chemicals utilized, and flavorings, are not readily available to the average consumer, much less children or youth; and

C.    Because the risks attendant to the aerosolized delivery of nicotine and other chemicals contained in JUUL are not readily available to or discoverable by the average consumer, much less children or youth.

137.    Defendant knowingly and intentionally misrepresented, failed to disclose, concealed and suppressed material facts regarding the JUUL device.  Defendant knowingly and intentionally misrepresented, failed to disclose, concealed and suppressed material facts regarding the JUUL device with the intent to mislead consumers and the Arkansas State Class.

55

138. Defendant's unfair, deceptive and/or illegal practices were material to La.S. and Le.S. and were likely to, and did in fact, deceive La.S. and Le.S. and reasonable consumers.

139. Defendant knew or should have known that its conduct violated Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*

140. Defendant owed an ongoing duty to refrain from unfair, deceptive, and/or unlawful acts or practices. Defendant owed to La.S. and Le.S., and the Arkansas State Class a duty to disclose the true facts regarding the JUUL device in their marketing, including the risks of dependence or addiction, the health risks, because

A. Defendant's advertisements were directed towards, targeted at, and designed to appeal to a vulnerable segment of society, children and youth;

B. Defendant possessed unique and/or exclusive knowledge relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings;

C. Defendant concealed and/or suppressed facts relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings; and

D. Defendant made incomplete and misleading representations with respect to the safety of the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings, giving rise to a duty of full disclosure to make the facts omitted by Defendant not misleading.

141. Defendant's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

142. Defendant's unfair, deceptive and/or unlawful acts or practices are ongoing and present a continuing risk to La.S. and Le.S. as well as the general public. Defendant's conduct therefore affects and endangers the public interest.

143.     La.S. and Le.S. suffered ascertainable loss and actual damages as a direct and proximate result of their reliance on Defendant's unfair, deceptive, and/or unlawful acts or practices.  La.S. and Le.S. experienced adverse consequences or losses, including the loss of money from purchasing the JUUL device, which were foreseeable results of Defendant's misrepresentations, concealment, and suppression of material facts.  As a direct and proximate result of Defendant's violations of the Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*, therefore, La.S. and Le.S. suffered injury-in-fact and actual damage.

144.     Pursuant to Arkansas Deceptive Trade Practices Act, Ark. Code Ann. § 4-88-101 *et seq.*, Plaintiff Saldana, on behalf of La.S. and Le.S., both minors, and in her capacity as the mother and natural guardian of La.S. and Le.S., seeks monetary relief against Defendant in an amount to be determined at trial, an order enjoining Defendant's unfair and/or deceptive acts or practices, punitive damages, attorneys' fees, costs, and any other just and proper relief available under the Arkansas Deceptive Trade Practices Act.

## COUNT FOUR — VIOLATIONS OF THE CALIFORNIA UNFAIR COMPETITION ACT, CAL. BUS. & PROF CODE § 17200 *ET SEQ.*

145.     Plaintiffs incorporate each preceding paragraph as though set forth fully herein.

146.     This count is brought on behalf of the Nationwide Class against Defendant.

147.     California Business and Professions Code, Cal. Bus. & Professions Code§ 17200 ("the UCL"), prohibits any "unlawful, unfair, or fraudulent business act or practices."  Defendant has engaged in unlawful, fraudulent, and unfair business acts and practices in violation of the UCL.

148.     Plaintiffs, E.L., B.Y., La.S., Le.S., and Defendant are "persons" within the meaning of Cal. Bus. & Professions Code § 17200.

149.     In the course of trade and commerce, Defendant participated in unfair, deceptive

and/or unlawful acts in violation of Cal. Bus. & Professions Code § 17200 by misrepresenting,

concealing and/or suppressing material facts concerning the JUUL device and its dangers.

150.     Defendant's principal place of business is San Francisco, California.  Upon

information and belief, Defendant's unlawful, unfair, and fraudulent business complained of

herein were developed, implemented, and emanated from Defendant's principal place of

business in San Francisco, California.  Upon information and belief, Defendant's

misrepresentations and omissions regarding the JUUL device, including Defendant's

advertisements, social media and social media strategy, and advertising strategy, including its

advertising strategy directed towards children and youth was developed, designed, implemented,

and emanated from Defendant's principal place of business in San Francisco, California.  Upon

information and belief, the JUUL device was developed in California.  California has a

substantial interest in the application of its law to the conduct alleged herein.

151.     As alleged throughout this Complaint, Defendant violated Cal. Bus. &

Professions Code § 17200 by failing to disclose material information about the addictiveness of

JUUL use; concealing and suppressing material information relating to the risk of dependence

and/or addiction to nicotine through JUUL use; and engaging in misleading advertising regarding

the risks of JUUL use, including by:

      A.     Failing to adequately and truthfully disclose the presence of nicotine in
JUUL; concealing and suppressing information regarding the presence of nicotine in
JUUL; and engaging in misleading advertising regarding the presence of nicotine in
JUUL;

      B.     Failing to adequately and truthfully disclose the amount of nicotine in
JUUL; concealing and suppressing information regarding the amount of nicotine in
JUUL; and engaging in misleading advertising regarding the amount of nicotine in
JUUL;

C.      Failing to adequately and truthfully disclose material information regarding the nicotine salts formulation in JUUL; concealing and suppressing information regarding nicotine salts formulation in JUUL; and engaging in misleading advertising regarding the nicotine salts formulation in JUUL;

D.      Failing to disclose the true nicotine exposure presented by JUUL use; concealing and suppressing information regarding the true nicotine exposure presented by JUUL use; and engaging in misleading advertising regarding the true nicotine exposure presented by JUUL use; and

E.      By failing to make disclosures necessary to make Defendant's statements regarding the JUUL device not misleading.

152.    As alleged throughout this Complaint, Defendant violated Cal. Bus. &

Professions Code § 17200 by failing to disclose material information about the health risks posed

by JUUL use; concealing and suppressing material information relating to the health risks posed

by JUUL use; and engaging in misleading advertising regarding the health risks posed by JUUL

use, including by:

A.      Failing to disclose, concealing and suppressing material information relating to the risk of nicotine dependency or addiction due to JUUL and engaging in misleading advertising regarding the risk of nicotine dependency or addiction due to JUUL;

B.      Failing to disclose, concealing, and suppressing information relating to the health consequences of nicotine dependency or addiction through JUUL use, including but not limited to the fact that nicotine is a neurotoxin and that nicotine causes cardiovascular, reproductive, and immunosuppressive problems;

C.      Failing to disclose, concealing, and suppressing information relating to the particularly potent threat to the adolescent brain posed by nicotine, including its effect on brain maturation, cognitive ability, mental health and personality;

D.      Failing to disclose, concealing, and suppressing information relating to the risks associated with chemicals utilized in JUULpods (in addition to nicotine) and the risks associated with aerosolized e-cigarette liquid;

E.      Falsely representing, affirmatively and/or by implication, that the JUUL was safe for use, including safe for use by children and youth, including by actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens; and

F.      By failing to make disclosures necessary to make Defendant's statements regarding the JUUL device and its safety not misleading, including representations relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings.

153.    As alleged throughout this Complaint, Defendant violated Cal. Bus. &

Professions Code § 17200 by engaging in conduct offensive to public policy and engaging in

immoral, unethical and unscrupulous business practices that expressly targeted a vulnerable and

impressionable segment of society, children and youth, including by:

A.      Actively seeking to enter school campuses, targeting children as young as eight through summer camps and school programs, extensively targeting youth through social media campaigns, and recruiting "influencers" to market to teens;

B.      By engaging in marketing tactics specifically designed to mislead children and youth and to ensnare minors into nicotine addiction, including by explicitly adopting tactics prohibited from Big Tobacco, with the knowledge that those tactics were likely to ensnare children and youth into nicotine addiction, including using billboards and outdoor advertising, sponsoring events, giving free samples, paying affiliates and "influencers" to push the JUUL on Defendant's behalf, and by selling JUUL in flavors designed to appeal to youth;

C.      Engaging in advertising modeled on cigarette ads and featuring youthful-appearing models and designing advertising in a patently youth-oriented fashion;

D.      Directing advertising to youth media outlets and media designed to appeal to children and youth, such as Instagram and other social media channels;

E.      Hosting youth-focused parties across the United States, at which free JUUL samples were dispensed and in which vaping was featured prominently across JUUL-sponsored social media; and

F.      Formulating JUULpods with flavors with the knowledge that such flavors appealed to youth and with the intent that youth become addicted or dependent upon JUUL products.

154.    As alleged throughout this Complaint, Defendant violated Cal. Bus. &

Professions Code § 17200 by manipulating the design of the JUUL e-cigarette and JUULpods to

maximize the addictiveness of the Company's products, suppressing and/or concealing

information regarding the product's design to maximize addictiveness, and engaging in

misleading advertising that failed to disclose material facts regarding the design of the product,

including:

> A.    That the JUUL was designed to manipulate nicotine pH to maximize delivery in a vapor while minimizing irritation or "throat hit;"

> B.    That the JUUL was designed to facilitate addiction, and particularly youth addiction, through the use of flavors that mask the naturally harsh flavor of tobacco;

> C.    That while a JUULpod may contain the same amount of nicotine as a pack of cigarettes, the amount of nicotine absorbed by the body was greater due to the nature and design of the JUUL e-cigarette and JUULpod;

> D.    That the JUUL was designed to increase the rate and amount of nicotine delivery; and

> E.    That the JUUL, in short, was designed to maximize the likelihood of nicotine addiction or dependence and actively designed to facilitate rapid onset of addiction or dependence, particularly in new smokers, youth, and children.

155.    As alleged throughout this Complaint, Defendant violated Cal. Bus. &

Professions Code § 17200 by manipulating the design of the JUUL to maximize its appeal to

minors and youth; and by manipulating and designing the JUUL to maximize its capacity to be

concealed.

156.    Consumers could not discern the true facts regarding Defendant's JUUL device

for many reasons, including *inter alia*:

> A.    Defendant's advertisements were directed towards, targeted at, and designed to appeal to a vulnerable segment of society, children and youth, who would be less capable of discerning the true facts relating to Defendant's addictive and dangerous product;

> B.    Because the true facts relating to Defendant's nicotine formulation (nicotine salts), nicotine concentration, other chemicals utilized, and flavorings, are not readily available to the average consumer, much less children or youth; and

C.      Because the risks attendant to the aerosolized delivery of nicotine and other chemicals contained in JUUL are not readily available to or discoverable by the average consumer, much less children or youth.

157.    Defendant knowingly and intentionally misrepresented, failed to disclose, concealed and suppressed material facts regarding the JUUL device with the intent to mislead consumers.

158.    Defendant's unfair, deceptive and/or illegal practices were material to consumers and were likely to, and did in fact, deceive reasonable consumers.

159.    Defendant knew or should have known that its conduct violated Cal. Bus. & Professions Code § 17200.

160.    Defendant owed an ongoing duty to refrain from unfair, deceptive, and/or unlawful acts or practices.  Defendant owed to minor consumers and the Nationwide Class a duty to disclose the true facts regarding the JUUL device in its marketing, including the risks of dependence or addiction, and other health risks, because:

A.      Defendant's advertisements were directed towards, targeted at, and designed to appeal to a vulnerable segment of society, children and youth;

B.      Defendant possessed unique and/or exclusive knowledge relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings;

C.      Defendant concealed and/or suppressed facts relating to the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings; and

D.      Defendant made incomplete and misleading representations with respect to the safety of the JUUL device, the nicotine formulation (nicotine salts) contained in JUULpods, the JUUL's aerosolized method of delivery, and the chemicals utilized in JUULpods, including its flavorings, giving rise to a duty of full disclosure to make the facts omitted by Defendant not misleading.

161.    Defendant's conduct offends public policy and is immoral, unethical, oppressive, unscrupulous, and substantially injurious to consumers.

162.    The conduct of the Defendant violates California's public policy of reducing and eventually eliminating the illegal purchase and consumption of tobacco products by minors, as declared, for example, by the California legislature in Cal. Bus. & Prof. Code § 22951 and the Stop Tobacco Access to Kids Enforcement Act generally, Cal. Bus. & Prof. Code Division 8.5.

163.    Defendant's conduct is immoral, unethical, oppressive, and/or unscrupulous because the gravity of the harm to the consumers outweighs any utility of the defendant's conduct.

164.    The injury to consumers is substantial, is not outweighed by any countervailing benefits to consumers, and due to the Defendant's unfair, deceptive, and/or unlawful acts such as those described above, the consumers could not have reasonably avoided the injury.

165.    Defendant's unfair, deceptive and/or unlawful acts or practices are ongoing and present a continuing risk to minor consumers and the Nationwide Class as well as the general public.  Defendant's conduct therefore affects and endangers the public interest.

166.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendant's business.  Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

167.    E.L., B.Y., La.S., and Le.S. suffered ascertainable loss and actual damages as a direct and proximate result of Defendant's unfair, deceptive, and/or unlawful acts or practices. E.L., B.Y., La.S., and Le.S.'s adverse consequences or losses, including the loss of money, were foreseeable results of Defendant's misrepresentations, concealment, and suppression of material

facts.  As a direct and proximate result of Defendant's violations of the Cal. Bus. & Professions Code § 17200, therefore, E.L., B.Y., La.S., and Le.S. have suffered injury-in-fact and actual damage.

168.    Pursuant to Cal. Bus. & Professions Code § 17200, Plaintiffs request that this Court enter such orders or judgments as may be necessary to enjoin Defendant from continuing its unfair, unlawful, and/or deceptive practices and to restore to the Nationwide Class any money Defendant acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

1.    Certifying this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the proposed Nationwide Class, or, in the alternative, the proposed Massachusetts, Illinois, and Arkansas State Classes described herein;

2.    Enjoining Defendant from engaging in further unconscionable, unfair, and deceptive practices as described herein;

3.    Awarding actual and compensatory damages;

4.    Awarding equitable relief to fund prevention education and addiction treatment;

5.    Awarding restitution under Cal. Bus. & Professions Code § 17200;

6.    Awarding punitive damages;

7.    Awarding reasonable attorneys' fees and costs of suit;

8.    Awarding pre-judgment and post-judgment interest; and

9.    Such other and further relief as the Court deems just and proper under the circumstances.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

RESPECTFULLY SUBMITTED this 16th day of September, 2019.

**KELLER ROHRBACK L.L.P.**

*/s/ Amy Williams-Derry*
Amy Williams-Derry
awilliams-derry@kellerrohrback.com
Derek W. Loeser, *pro hac vice forthcoming*
dloeser@kellerrohrback.com
Gretchen Freeman Cappio, *pro hac vice forthcoming*
gcappio@kellerrohrback.com
Dean Kawamoto, *pro hac vice forthcoming*
dkawamoto@kellerrohrback.com
Alison S. Gaffney, *pro hac vice forthcoming*
agaffney@kellerrohrback.com
1201 Third Avenue, Suite 3200
Seattle, WA 98101-3052
Tel: (206) 623-1900
Fax: (206) 623-3384

Alison Chase, *pro hac vice forthcoming*
achase@kellerrohrback.com
801 Garden Street, Suite 301
Santa Barbara, CA 93101
Tel: 805.456.1496
Fax: 805.456.1497

*Attorneys for Plaintiffs*
